State v. Powell.

No. 26,046.

THE STATE OF KANSAS, *Appellee*, v. O. A. POWELL, *Appellant*.

No. 26,050.

THE STATE OF KANSAS, *Appellee*, v. J. N. RICHARDSON, *Appellant*.

SYLLABUS BY THE COURT.

1. BANKS AND BANKING—*Prosecution for Fraudulent Banking—Amendment of Transcript.* The warrant of arrest served on the president and the vice president of a bank in a prosecution for violation of the section of the banking act relating to fraudulent banking, charged accepting and receiving and permitting and conniving at receiving and accepting deposits by the bank, knowing it to be insolvent. After a preliminary examination, the examining magistrate found the crime of accepting and receiving deposits had been committed, and there was reasonable ground to believe defendants to be guilty. The information charged defendants with permitting and conniving at receiving and accepting deposits. A plea in abatement was filed alleging no preliminary examination on the charges contained in the information. At the hearing on the plea the court found the evidence at the preliminary examination established the facts that the crime charged in the warrant had been committed, and there was reasonable ground to believe defendants to be guilty. *Held,* omission of the examining magistrate to enter on his record the facts appearing at the preliminary examination that the crime of permitting and conniving at receiving and accepting deposits had been committed, and that reasonable cause existed to believe defendants guilty, might be cured by bringing these additional facts on the record by amendment, provided it could be done without prejudice to substantial right.

2. SAME—*Amendment of Transcript—Plea in Abatement.* The amendment having been made and no prejudice having been shown, the plea in abatement was properly overruled.

3. SAME—*Amendment of Transcript—Proper Party.* The examining magistrate was judge *pro tem.* of a city court. He was not serving as such officer at the time of the hearing on the plea in abatement. *Held,* he was the proper person to amend the record.

4. SAME—*Information—Duplicity.* The information contained nine counts relating to deposits by nine different depositors. *Held,* the information was not bad for duplicity.

5. SAME. Each count charged permitting and conniving at receiving and accepting the deposit of a named depositor. *Held,* none of the counts was bad for duplicity.

Banks and Banking, 7 C. J. pp. 580 n. 26, 582 n. 50, 584 n. 73, 585 n. 87; 20 L. R. A. n. s. 444; L. R. A. 1915C, 732; 3 R. C. L. 493-499. Connivance, 12 C. J. p. 508 n. 95. Criminal Law, 16 C. J. pp. 313 n. 62, 344 n. 87, 406 n. 26. Permit, 30 Cyc. p. 1462 n. 21.

State v. Powell.

6. Same—*Information—Sufficiency as to Allegation of Insolvency.* Essential elements of the offense were insolvency of the bank and knowledge of its insolvency when the deposits were received. The information did not contain a direct allegation that the bank was insolvent. It did charge defendants with permitting and conniving at receiving and accepting deposits, well knowing the bank was insolvent. *Held,* the information was sufficient.

7. Same—*Information—Sufficiency.* Various grounds of a motion to quash the information considered, and *held,* the motion was properly denied.'

8. Same—*Evidence of Insolvency—Competency of Opinion Evidence.* The banking act provides that a bank shall be deemed insolvent when the actual cash market value of its assets is insufficient to pay its liabilities. *Held,* opinion evidence that the bank was insolvent is not admissible in a prosecution for fraudulent banking.

9. Same—*Opinion Evidence—Nonprejudicial Admission.* The evidence in a prosecution for fraudulent banking considered, and *held,* opinion evidence that the bank was insolvent was not prejudicial.

10. Same—*Evidence—Admission.* Assignments of error relating to rulings respecting admission and rejection of evidence considered, and held not to be well founded.

11. Same—*Liabilities — What Constitutes.* In a prosecution for fraudulent banking, the capital, surplus and undivided profits of the bank are not to be counted as liabilities in striking a balance between assets and liabilities.

12. Same—*Instruction.* Assignments of error relating to instructions given and refused considered, and held not to be well founded.

13. Same—*Punishment — Fine and Imprisonment.* The statute relating to fraudulent banking provides for punishment by both fine and imprisonment. *Held,* the statute is not qualified by a provision of the crimes and punishments act of 1868 to the effect that imposition of a fine is not authorized when the offender is sentenced to confinement and hard labor.

14. Same—*Knowledge of Insolvency—Evidence—Instruction.* In a prosecution of an officer of a bank for fraudulent banking, the defense was the officer did not know the bank was insolvent until after banking hours on the day the deposits were received. He offered evidence of a succession of closely related events occupying the time from the closing of the bank until midnight of the same day, tending to prove that another officer was solely responsible for the bank's insolvency, and that the insolvency became known for the first time in the course of the events. *Held,* the evidence was admissible. *Held further,* the state of the case was such that rejection of the evidence was prejudicial. *Held further,* the error committed in rejecting the evidence was intensified by certain instructions given the jury.

15. Same—*Reception of Deposits—Authority of Vice President—Instructions.* Instructions relating to authority of a vice president of the bank to prevent reception of deposits by the bank after discovery of insolvency considered, and held to be erroneous.

16. SAME—*Knowledge of Insolvency—Admission of Evidence as to Value of Home.* The contested issues in the vice president's case were, whether the bank was insolvent, and whether he knew of the insolvency when deposits were received. The court permitted the state to introduce in evidence, over his objection, photographs of his home, and sent the jury to view his house and grounds. The evidence was made the basis of an acrimonious harangue in the closing argument for the state. *Held,* the evidence was impertinent to the issues, and the licensed invective was derogatory to the dignity of the court, the decorum of the trial, and the interest of truth and justice.

Appeals from Sedgwick district court, division No. 3; JESSE D. WALL, judge. Opinion filed April 10, 1926. Case No. 26,046 reversed. Case No. 26,050 affirmed.

: *Robert C. Foulston, George Siefkin, Sidney L. Foulston, A. V. Roberts,* all of Wichita, *W. H. Carpenter* and *W. R. Carpenter,* both of Marion, for appellant O. A. Powell. *George McGill, John W. Adams, William J. Wertz, James A. Conly, Victor J. Rogers* and *George L. Adams,* all of Wichita, for appellant J. N. Richardson.

*Charles B. Griffith,* attorney-general, *W. A. Blake,* county attorney, *S. A. Buckland* and *S. B. Amidon,* both of Wichita, for the appellee.

The opinion of the court was delivered by

BURCH, J.: An information was filed charging J. N. Richardson, president, O. A. Powell, vice president, and other officers of the American State Bank of Wichita, with violation of the section of the banking act making it a felony for a bank to receive deposits while it is insolvent. Richardson and Powell were convicted at separate trials, and appeal. Assignments of error common to the two cases may be considered together.

The statute reads as follows:

"No bank shall accept or receive on deposit, with or without interest, any money, bank bills or notes or United States treasury notes, gold or silver certificates, or currency, or other notes, bills, checks, or drafts, when such bank is insolvent; and any officer, director, cashier, manager, member, partner or managing partner of any bank who shall knowingly violate the provisions of this section or be accessory to or permit to connive at the receiving or accepting on deposit of any such deposit, shall be guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding five thousand dollars, or by imprisonment in the penitentiary not less than one year nor more than five years, or by both such fine and imprisonment." (R. S. 9-119.)

The complaint furnishing the foundation for the warrant contained nine counts. Each count related to a separate deposit, and charged defendants with accepting and receiving and permitting

and conniving at receiving and accepting the deposit, knowing the bank to be insolvent. The warrant of arrest recited the charges contained in the complaint, and was returned to the city court of Wichita, where a preliminary examination was held by a judge *pro tem.* The proceedings were taken by a stenographer, who made a transcript showing what occurred. At the conclusion of the preliminary examination, the judge *pro tem.* signed separate journal entries, identical in form except as to name, holding defendants for trial. The journal entry in the Richardson case reads as follows:

"After hearing the evidence and argument of counsel, the court finds that the offense of receiving and accepting deposits in the American State Bank, a banking institution, on the 18th day of June, 1923, and knowing the bank to be in an insolvent condition, has been committed as charged in the first, second, third, fourth, fifth, sixth, seventh, eighth and ninth counts of the complaint and warrant, and there is reasonable ground to believe that the defendants, J. N. Richardson, Phil Drumm, R. E. Crummer and O. A. Powell, committed the offense in each charge.

"Whereupon the defendant, J. N. Richardson, is bound over to appear at the district court of Sedgwick county, Kansas, on the first day of the next term thereof, to answer said charge."

In due time an information containing nine counts, specifying the deposits referred to in the complaint and warrant, was filed. The defendants were charged with permitting and conniving at receiving and accepting the deposits, knowing the bank to be insolvent. Pleas in abatement were filed asserting defendants had not waived or had a preliminary examination on the charges contained in the information. The state moved to correct the journal entries, and a hearing before the court followed. The court found the stenographer's transcript and the journal entries disclosed exactly what the judge *pro tem.* did, but that he intended to hold defendants on the charges set forth in the warrant, and erroneously failed to do so. Thereupon, the judge *pro tem.*, who was no longer serving in the city court, was permitted to make new journal entries, showing a finding that the crime of permitting and conniving at receiving and accepting deposits had been committed, and there was reasonable ground for believing defendants to be guilty. The new journal entries also contained the following:

"I further certify that the above is a true journal entry and statement of facts as intended to be rendered by me on the 13th day of September, 1923, and I further certify that this correction has been made by me to state the facts more fully concerning the judgment and findings as intended to be made

by me at said hearing, and is a correct statement of the facts and judgment as intended to be rendered by me on said date and at said hearing.

"It is further ordered that this completed transcript be rendered by me on said date and at said hearing.

"It is further ordered that this completed transcript be entered and filed as of the date of September 13, 1923, at which date the same were by me made and found at said preliminary examination."

The pleas in abatement were renewed and demurrers to them were sustained.

The statute which has been quoted may be analyzed as follows:

1. No bank shall accept or receive a deposit while insolvent, and any officer of the bank who knowingly violates this prohibition is guilty of a felony.

2. Any officer who, knowing the bank to be insolvent, is accessory to the receiving or accepting of a deposit by the bank while it is insolvent, is guilty of a felony.

3. Any officer who, knowing the bank to be insolvent, permits it to receive or accept a deposit while it is insolvent, is guilty of a felony.

4. Any officer who, knowing the bank to be insolvent, connives at the receiving or accepting of a deposit by the bank while it is insolvent, is guilty of a felony.

Under No. 1, the officer must be actor, and must personally conduct or supervise the transaction with the depositor. (*State v. Warner,* 60 Kan. 94, 55 Pac. 342.) Under 2, 3 and 4, the officer is not actor, does not deal personally with the depositor, but is privy to reception of the deposit by the bank. Under 2, the officer is connected with the act by instigation or command, counsel or advice, and the like, and so becomes a party to it, although not personally participating in the passing of the deposit over the bank's counter. Under 3 and 4, the officer suffers the act to be done. The word permit may be used in the active sense of to license, or to grant express authority. More often, and generally, it is used in the sense of consent to; suffer or allow to be done; tolerate. Connivance is corrupt or guilty assent to a wrongful act, not involving actual participation in it, but involving knowledge of it, and failure to oppose or prevent it. To connive at is to be indulgent to, or disregardant of; to wink at, which is synonymous with to tolerate. The result is, to be accessory to, to permit, and to connive at the receiving or accepting of a deposit by an insolvent bank, are modes of the same kind

of conduct—indirect participation of an officer in the receiving or accepting of a deposit which he does not personally handle.

Defendants contend they were arrested and given a preliminary examination on a warrant charging both direct and indirect participation in the receiving of deposits, were held to answer for direct participation only, and then were charged in the information with indirect participation only; and because the record in the city court disclosed no finding of indirect participation and probable cause to believe defendants guilty of that offense, and a binding over for that offense, there was no legal foundation for the information.

Procedure by preliminary examination takes the place of procedure by grand jury, but corresponds to procedure by grand jury to this extent only: It is a method of determining whether a suspect should be held for trial, and serves to prevent escape of the guilty and detention of the innocent. (*State v. Bailey,* 32 Kan. 83, 3 Pac. 769.) The two methods of precedure differ in these important respects: Preliminary examination affords, and is designed to afford, general information to the person held to answer respecting what he must meet. It does not definitely fix the form of the charge to which he must plead.

Regularity of procedure requires that in case the person arrested is held, the examining magistrate shall find a specified crime has been committed, and shall find there is probable cause to believe the person to be guilty of that crime; shall enter the findings, the proceedings respecting bail or commitment, and all other proceedings of the examination, upon his docket or other record; and shall fully and accurately certify and return the examination and the recognizance taken to the district court. Regularity of procedure further requires that the information shall conform to this record. Ignorance, inexperience, lack of faculty for precision, and proneness to carelessness, prevail to such an extent it is vain to expect such regularity; and to prevent failure of justice, allowance must be made for irregularity.

In the case of *State v. Tennison,* 39 Kan. 726, 18 Pac. 948, there was a coroner's verdict finding death by poison feloniously administered, as the jury believed, by Mrs. Tennison. The warrant on which the preliminary examination was held contained the recitals of the verdict. A full preliminary examination was held, but the docket entry merely noted there was sufficient evidence to warrant binding defendant over. However, the order of commitment, also entered on

the docket, stated the offense of murder had been committed, and there was probable cause to believe defendant guilty. Suppose the order of commitment had merely stated sufficient evidence was produced to warrant binding the defendant over, and for want of bail she was committed to be held until the next term of the district court, and an information for murder had been filed. It is conceived that a plea in abatement alleging no preliminary examination would be bad.

The code of criminal procedure provides that no information for felony shall be filed against any person, except a fugitive from justice, until such person shall have had a preliminary examination therefor. It does not provide that no information shall be filed until a transcript of record is before the district court, or until a record has been made, showing the defendant had a preliminary examination upon the charge stated in the information. A record of preliminary examination, or a transcript of such record filed in the district court, is not essential to jurisdiction to entertain an information. The essential thing is a preliminary examination with respect to the charge contained in the information. If no transcript has been filed the court may order one sent up. If the docket of the examining magistrate was mutilated or destroyed before a transcript was made, the court would determine from the best evidence obtainable what had taken place. (*State v. Stevens*, 56 Kan. 720, 44 Pac. 992.) It is conceived the same would be done if, after taking bail for trial or committing for trial, the examining magistrate failed or was unable to write up his docket.

In the case of *State v. Bailey*, 32 Kan. 83, 3 Pac. 769, the court said:

"The question as to whether a preliminary examination has ever been had in any particular case, may be raised in various ways: . . .

"When the question is raised by a plea in abatement, as in the present case, we think the only questions presented for consideration are, whether an attempt has been made to give the defendant a preliminary examination, and whether by such attempt reasonable notice has been given to him with regard to the nature and character of the offense charged against him. . . . It is not necessary that the papers and proceedings on a preliminary examination should be technically regular and exact, like the papers and proceedings on the final trial. It is not necessary that the papers and proceedings on a preliminary examination should set forth the offense in all its details and with perfect and exhaustive accuracy. For the purpose of authorizing a final trial and of requiring that the defendant should plead to the merits of the action, all that is necessary is that the defendant should be given a fair opportunity

State v. Powell.

to know by a proffered preliminary examination the general character and outlines of the offense charged against him; and it is not necessary that all the details and technical averments required in an information should be set forth in the papers used on the preliminary examination. And the defendant should take notice from the evidence introduced by the state on the preliminary examination, as well as from the papers in the case, of the nature and character of the offense charged against him." (pp. 88, 89.)

This decision did not deal specifically with variance between definite record of a preliminary examination and an information. The subject was considered in the case of *State v. Spaulding,* 24 Kan. 1. In the opinion by Justice Brewer it was said:

"It will be remembered that these preliminary proceedings are generally had before justices of the peace, officers not learned in the law, and if the same fullness and precision, the same precautions against all the contingencies of the testimony were required there as in the information or indictment, justice would be often delayed and defeated. All that can be required is, that there shall be a single statement, containing the substantial facts of the offense charged, and then the prosecutor, in preparing the information, may use many counts, varying in them the formal and nonessential matters of the crime. He may not add a new offense. To larceny he may not add robbery; nor to murder, arson. Neither may he add to the larceny of one piece of property, the larceny of another. He may not substitute one offense for another; but he may, by several counts, guard against the contingencies of the testimony." (p. 4.)

The rule thus stated was applied in the case of *State v. Jarrett,* 46 Kan. 754, 27 Pac. 146. The complaint charged defendant with larceny from a specified house of thirty-six dollars in currency and coin. The warrant charged larceny from the same house of bills and coin of specified denominations amounting to thirty-six dollars, belonging to a specified person. Defendant waived preliminary examination. It was held the information should not include with the articles mentioned in the warrant, a pocketbook and a promissory note stolen by defendant at the same time and at the same place from the same person. The state was not obliged to accept defendant's waiver of preliminary examination. Having done so, it followed logically from the opinion in the Spaulding case that the information could not add two stolen articles not described in the record at the time of waiver. The decision revealed the technical character of the rule stated in the Spaulding case. Defendant was tendered a preliminary examination, and he was bound to know the warrant was indicative rather than descriptive, was not necessarily complete or accurate, and might not give a full statement of the larceny which the information would charge.

To escape the consequences of the formalistic rule, prosecutors resorted to the practice of moving for correction of the preliminary examination record to make it speak the truth—sometimes to make it speak the language of the information. The practice was made exigent by what was said in the opinion in the case of *State v. Goetz*, 65 Kan. 125, 69 Pac. 187:

"While one object of a preliminary examination is to inform the defendant of the nature and character of the crime charged against him, it is also a step, and a necessary step, in the proceeding that leads up to his trial in the district court. He may not be put upon his trial without the finding of the examining magistrate that there is probable cause for believing that he is guilty of the crime charged, and until a preliminary examination has ripened into such a finding and a consequent binding over to the district court, the county attorney is not authorized to file an information against him." (p. 127.)

This statement must be restrained to the subject before the court for decision. The complaint and warrant charged assault with intent to kill. The magistrate announced he did not find probable cause for charging defendant with the offense; but the county attorney subsequently filed an information charging assault with intent to kill. The statute requires that the prisoner shall be discharged if upon the whole examination it appears to the magistrate there is not probable cause, and of course no information may be filed based on a preliminary examination resulting in a finding of want of probable cause.

Any judicial or quasi-judicial record may be made to conform to the facts, and the practice, when resorted to in good faith, may be freely indulged with respect to records of preliminary examinations because the proceeding is not a trial, but an inquest; the result is not a judgment having the qualities of finality and conclusiveness, and the record may be impeached. The end to be obtained by amendment, however, is truth, not falsification, and limitations upon power to amend were stated in the case of *State v. Geary*, 58 Kan. 502, 49 Pac. 596, as follows:

"The requirement to certify such cases to the trial court implies, of course, the obligation to fully and truly certify them; and the obligation to fully and truly certify, implies the power to correct mistakes and supply omissions. A justice of the peace may not amend his transcript so as to make it speak something entirely different from what it had spoken before, or show an additional fact, upon the nonexistence of which the defendant has been led to waive some legal right or otherwise put himself in a false position; but such justice may perform the clerical work of completing his transcript, so as to make it speak the truth, as late as any occasion for so doing may justify." (p. 504.)

This declaration was made in a case in which nothing was involved except the making of some indorsements on some papers—the completion of discharge of a purely ministerial duty. It is significant, however, that in drawing the distinction between what may and what may not be done by amendment, the then chief justice of the court, who prepared the opinion, recognized that the way must be left open for supplying an omission by introduction of an additional fact, provided it can be done without prejudice to substantial right.

The statute reads as follows:

"If it shall appear that an offense has been committed, and that there is probable cause to believe the prisoner guilty, and if the offense be bailable by the magistrate, and the prisoner offer sufficient bail [for appearance for trial], it shall be taken and the prisoner discharged; but if no sufficient bail be offered, or the offense be not bailable by the magistrate, the prisoner shall be committed for trial.

"If upon the trial [preliminary examination] it shall appear that the defendant is guilty of a public offense other than that charged in the warrant, he shall be held in custody of the officer, and tried for such offense, a reasonable opportunity having been given him to obtain his witnesses and prepare his defense." (R. S. 62-620, 62-621.)

The language of both sections is "if it shall appear." As indicated, the magistrate ought to make a record of what appeared, but a plea in abatement is not tried solely on the record. The examining magistrate may require the evidence to be reduced to writing and signed. Whether so preserved or not, the defendant must take notice of it. If the evidence has not been preserved, the nature of it may be proved; and the court is of the opinion an omitted fact which sufficiently appeared at the preliminary examination to satisfy the condition of the Bailey case may be added to the record by amendment, under the condition stated in the Geary case.

In the instant case the pleas in abatement themselves disclose that a preliminary examination was held. Aside from existence of the bank and the relation of defendants to it, the subjects of investigation were four: First, Was the bank insolvent? Second, Were deposits received? Third, Did defendants know the bank was insolvent? Fourth, Did defendants participate in the reception of the deposits? The stenographer's transcript disclosed what took place. From that transcript the district court found there was evidence produced at the preliminary examination warranting a finding that the offense charged in the warrant had been committed, and there

was probable cause to believe defendants were guilty. There was a contention defendants were not permitted to produce evidence at the preliminary examination to overcome the proof of insolvency, but the district court's finding is not contested. Therefore, the conditions of the Bailey case were satisfied. As indicated, method of participation in the reception of deposits might be of two kinds, direct and indirect, and methods of indirect participation might be of three kinds. Any detail of manner of participation which appeared, but which the examining magistrate omitted to note, could be supplied by amendment without prejudice, and there is neither showing nor contention that defendants were led to waive any legal right, or put themselves in any false position, because of the form of the original record. The contentions are, there was no preliminary examination, and the amendment was unauthorized. Neither contention is well founded.

The fact that the person who held the preliminary examination was no longer acting as judge *pro tem.* of the city court when the amendment was made is not important. He was not exercising functions of the judge of the city court when the preliminary examination was held. He was simply an officer clothed with and exercising the authority of an examining magistrate, and he was the proper person to fix up his own record.

In the writer's opinion, amendment under the circumstances stated is nothing but a concession to that choking formalism which, like a tropical jungle, continually encroaches upon the fruitful domain of the law. When the facts warranting amendment have been established, the plea in abatement should simply be overruled. The writer regards the ado in the district court over amendment, and the amendment in the case of *State v. Miner*, ante, p. 187, 243 Pac. 318, as farcical. Because, in his opinion, the defendant in the Miner case was not fairly apprised that he was held to answer for a course of conduct in addition to a crime, and the amendment procedure was abused and perverted, he dissented.

The first count of the information charged that defendants, being officers of the American State Bank, a banking corporation duly organized and existing, on the 18th day of June, 1923, as such officers—

"Did then and there unlawfully, feloniously, willfully, and knowingly and intentionally permit and connive at receiving and accepting a certain deposit of money in the said the American State Bank, to wit: $100 of good and

State v. Powell.

lawful money of the United States of America, of the value of $100, the money and property of one Mrs. M. E. Bigger; they, the said J. N. Richardson, Phil Drum, R. E. Crummer and O. A. Powell, well knowing at said time that the said the American State Bank was insolvent. . . ."

Eight other counts of the information related to deposits of other persons. A motion to quash the information was denied. One ground of the motion was that the information was bad for duplicity, and another ground was that two distinct felonies were charged in each count of the information—permitting and conniving at receiving and accepting the deposit.

Under the statute, the bank receives the deposit, which becomes property of the bank, and the bank becomes the depositor's debtor. The evil consequence is loss to the depositor through the bank's insolvency. The bank could be punished by fine only, which would further injure depositors, and the fraud involved in taking their money when the bank ought to be in process of liquidation can be reached only by holding the bank's officers and managers responsible. In the case of *State v. Warner,* 60 Kan. 94, 55 Pac. 342, the information charged the president of a bank, in certain counts with accepting and receiving various deposits, in other counts with being accessory, and in other counts with permitting and conniving. Defendant was convicted on those counts only which charged accepting and receiving. The court held accepting and receiving meant personally accepting and receiving, held there was no evidence of such accepting and receiving, and set aside the conviction. A motion to quash had been filed on the ground the information contained several counts charging distinct felonies. In this court this motion related to the counts on which defendant was convicted, because all others were out of the case. Therefore, the motion was, in effect, that a count for accepting and receiving a deposit by "A" could not be joined with a count for accepting and receiving a deposit by "B." The court applied the rule relating to joinder of misdemeanors of the same general character and requiring the same kind of proof, and held the motion to quash had been properly denied. The court properly referred to each count as charging a separate and distinct felony. But the court did not hold, and the decision is no authority for a holding, that a charge in one count of accepting and receiving and permitting and conniving at accepting and receiving a deposit by "A" would be bad for duplicity. Under the authority of the

Warner case, the court holds the information was not duplicitous for joining several counts relating to deposits of different persons.

The essence of the offense charged in the first count was the receiving of Mrs. Bigger's deposit of $100—a single transaction. The statute made it a crime for defendant to be connected with the transaction in any one of several ways disjunctively enumerated. Whether defendant were related to that transaction in one way or more than one way, the offense was single, could be punished but once, and could be charged by alleging conjunctively all the ways. A leading case establishing the principle is *Byrne et al. v. The State,* 12 Wis. 519 (1860). Inspectors at an election were indicted for knowingly receiving and sanctioning the reception of an illegal vote. In the opinion by Chief Justice Dixon it was said:

"The objection of duplicity is untenable. The rule is well settled that, where a statute makes either of two or more distinct acts, connected with the same general offense and subject to the same measure and kind of punishment, indictable separately and as distinct crimes, when each shall have been committed by different persons or at different times, they may, when committed by the same person at the same time, be coupled in one count, as constituting altogether but one offense. In such cases the several acts are considered as so many steps or stages in the same affair, and the offender may be indicted as for one combined act in violation of law; and proof of either of the acts mentioned in the statute and set forth in the indictment will sustain a conviction. . . . There can be no doubt that the receiving and sanctioning the reception of a vote, under the circumstances stated in the statute, are distinct offenses, and when committed separately may be indicted as such, but the indictment is not double or uncertain because both are joined in the same count for the reasons above stated." (pp. 525, 526.)

In the Byrne case the offense charged was a misdemeanor. The reasoning of the opinion applies equally to pleading modes of commission of a felony, and has been applied under the fraudulent banking acts of other states similar to the statute of this state:

"In a prosecution of a bank president under section 222, Mills' Ann. Stats., providing that if the president of any bank 'shall receive or assent to the reception' of any deposit of money in such bank after he shall have knowledge of its insolvency he shall be guilty of larceny, an information that charges in one count that the defendant 'did receive and assent to the reception' of a deposit after he had knowledge of the insolvency, is not invalid as charging two separate offenses in one count." (*McClure v. The People,* 27 Colo. 358, syl. ¶ 1.)

"An indictment charged in one count that defendant knowingly received and accepted a check on deposit and knowingly permitted a check to be received and accepted on deposit when the bank was insolvent. *Held,* the in-

State v. Powell.

dictment charged the commission of but one offense, and was good on demurrer." (*Wilkin v. State,* 121 Ark. 219, syl. ¶ 1.)

The result is, no count of the information was bad for duplicity because it charged permitting and conniving at receiving and accepting the particular deposit specified.

One ground of the motion to quash was that the information failed to state a public offense, and it is urged the information did not allege the bank was insolvent. Insolvency of the bank was an essential ingredient of the offense, and the criminal code contains the following provision:

"The indictment or information must be direct and certain as it regards the party and the offense charged." (R. S. 62-1005.)

Insolvency was inferable from the charge of knowledge—"well knowing at the said time that the said American State Bank was insolvent." Defendants could not know the bank was insolvent unless it was insolvent. Numerous pertinent authorities are cited which hold that such a statement does not charge insolvency.

The article on sufficiency of indictments and informations contains the following provisions:

"The indictment or information is sufficient if it appear therefrom—

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"*Fourth.* That the offense charged is clearly set forth, in plain and concise language, without repetition. And,

"*Fifth.* That the offense charged is stated with such a degree of certainty that the court may pronounce judgment upon conviction, according to the right of the case.

"No indictment or information may be quashed or set aside for any of the following defects:

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"*Seventh.* For any other defect or imperfection which does not tend to the prejudice of the substantial rights of the defendant upon the merits." (R. S. 62-1010; R. S. 62-1011.)

The criminal code of Minnesota contained similar provisions, except that one was that no indictment should be held insufficient by reason of defect in *matter of form* which did not tend to prejudice of substantial rights of the defendant on the merits. Interpreting the statute, the Minnesota court said:

"These are wholesome and sensible provisions, which should be liberally construed, and indictments sustained where the objection is as to matters of form, and not of substance. But they were not intended to encourage laxity in criminal pleading in matters of substance, but simply to cure 'a disease of the law' resulting from the overnicety of courts and their lack of practical

sense in giving effect to formal defects in indictments. The statute dispenses with mere formality and technicality, but the requirement that the indictment must be direct and certain as regards the offense, and the particular circumstances thereof,. is imperative. . . . The rule that the charge must be laid positively, and not inferentially by way of recital merely, is not abrogated by the statute." (*State v. Howard,* 66 Minn. 309, 312.)

We have here what was regarded, in its day, as a radical reform of criminal procedure. Formality and technicality in pleading were to be banished; that is, unless a matter of form should be prejudicial to substantial right. This conception was the fundamental cause of the disease of the law. The legislature of this state evidently concluded there was some overnicety in a statute which took it for granted that a mere matter of form might prejudice substantial right, and framed R. S. 62-1011 with more practical sense. R. S. 62-1005 requires definiteness and certainty, but R. S. 62-1010 recognizes degrees of certainty, and R. S. 62-1011 makes prejudice to substantial right on the merits the test, whether the defect be one of form or substance.

The merits referred to in the statute are merits forecast by the information, as the case stand before plea. When a motion to quash an information has been denied, a trial has been had, an appeal has been taken, and denial of the motion to quash is assigned as error, the question whether the defect prejudiced any substantial right is to be determined from the whole record, and another statute provides as follows:

"On an appeal, the court must give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties." (R. S. 62-1718.)

What has just been said disposes of contentions that the information was bad because it did not charge that the American State Bank (alleged to be a banking corporation organized and existing under the laws of the state of Kansas and authorized to do business in Sedgwick county) was a bank of deposit; because it did not charge that the deposit was made on deposit, or state the purpose of the deposit; because it failed to show a completed act of deposit; and because it failed to show who was permitted to receive, or who was connived with.

Defendants could not be guilty of the crimes charged unless the bank were insolvent on the 18th day of June, 1923, the day the deposits were taken. The legislature has defined insolvency as follows:

"A bank shall be deemed to be insolvent—*first,* when the actual cash market value of its assets is insufficient to pay its liabilities; *second,* when it is unable to meet the demands of its creditors in the usual and customary manner; *third,* when it shall fail to make good its reserve as required by law." (R. S. 9-133.)

There was no evidence of failure to make good reserve as required by law; that is, within thirty days after notice from the bank commissioner to do so. An effort to show inability of the bank to meet a creditor's demand in the usual and customary manner was not successful, and the question was whether the actual cash market value of the bank's assets was insufficient to pay its liabilities.

In the Richardson case the bank's daily statement for June 18 was introduced in evidence, but was not read. The document has been lost, and it is not possible to make from the record a complete statement of the bank's condition on that day. However, the result of an examination of the bank in November, 1922, appears. The official statement of the bank's condition on January 10, 1923, appears. What seems to have been an official statement of the condition of the bank on April 10, 1923, was read to the jury, but the document was not copied into the record, and has been lost. Items of the schedule made by the receiver of the bank of what he found when he took possession on June 19, were read into the record. Permanent assets such as the bank building and furniture and fixtures are disclosed by previous statements, but the amount on June 18 of certain items of assets which fluctuate from time to time are not ascertainable. The record in the Powell case is substantially complete.

The normal way to prove the actual cash market value of the assets of the bank was to take *seriatim* the classes of its resources which appear in condensed bank statements, loans and discounts, overdrafts, real estate, furniture and fixtures, other real estate, bonds with the state treasurer, bonds and warrants, cash and sight exchange, and other resources, and prove the value of all except those classes whose value is established *prima facie* by description. This method was followed in part only. For example, the value of real estate and furniture and fixtures was not proved at all, although bank examiners' report disclosed they were carried on the books at much less than actual value. These two items equaled from seventy-five to ninety per cent of capital stock.

The value of the notes in the note case and some other paper

was proved, shortages in bond account and correspondent bank accounts were proved, and a deficiency of assets carried on the books as possessed by the bank was established in the sum of $2,084,291. In connection with this proof, witnesses were asked whether the bank was solvent or insolvent, and the answers were that the bank was insolvent. Details showing the state of the case, qualification of witnesses, and form of question, need not be recited. Solvency is a matter of statutory definition, and includes actual cash market value of assets with which to discharge liabilities. It is not a mere matter of conception of a financial condition expressible by a word, and the opinion evidence should not have been received.

The case of State v. Myers, 54 Kan. 206, 38 Pac. 296, was decided under the banking act of 1891, which contained no definition of insolvency. Under that statute, insolvency meant no more than inability to meet liabilities in the usual course of business, and there was ground for permitting expression of opinion that the bank was or was not insolvent at a particular time. The court held, however, that such an opinion could not be received in evidence. A fortiori, under the statutory definition inserted in the banking act of 1897, the opinion of a witness may not be substituted for the facts necessary to establish insolvency. Value reduces ultimately to matter of opinion, and a qualified witness may testify to actual cash market value. Inventories, schedules, summaries, and abstracts, properly prepared and duly proved, of voluminous or multifarious evidential matter, such as bank books, records and documents not easily comprehended by a jury unless presented in tabloid form, may be used. Results of computations based on such data, stated in figures, are admissible. But testimony such as the following, given in the Richardson case, was manifestly improper:

"Q. If the losses were $643,000 at that time, was that bank solvent or insolvent? . . . A. Insolvent."

Likewise, the following testimony, given by a bank examiner in the Powell case, was improper:

"Q. Now, Mr. Bowman, if this amount of a million and some eight hundred thousand dollars of bonds had not been in the bank at that time, what— had not been owned by the bank at that time—what would have been the condition of the bank? . . . A. I would say that the bank was badly involved, and ought to close up.

"Q. It would have been insolvent? A. Yes; if I had been there I would have shut the door on them as sure as the world."

Each defendant was sentenced to pay a fine of $45,000 and to be confined in the penitentiary for an indeterminate period of nine to forty-five years. The testimony wrongfully received, only a portion of which has been quoted, bore upon a major issue, and the court is confronted with discharge of the solemn duty of determining from the entire record whether the error committed by admitting the evidence was prejudicial to the substantial rights of Richardson.

The bank failed. In several states failure of a bank is made *prima facie* evidence of insolvency, by statute. Without a statute, failure of a bank appeals to the mind as indicative of insolvency, because solvent banks do not fail, except from extraordinary causes of a character which did not contribute to failure of the American State Bank of Wichita. It failed because it had been plundered. There was evidence that it could have survived a loss of $300,000 on its loans had its book assets been in existence; but its best assets aside from cash, assets which were practically equivalent to cash in the safe, were gone. When its accounts with its city correspondents were reconciled, the amount shown by the books to be due from other banks was short in the sum of $428,455.66, and bonds to the amount of $1,602,086, which should have been in the vault, were not there. The bank had a capital of $150,000, its book surplus was $150,000, and its book undivided profits were $99,363. The shortage in the two accounts mentioned was more than five times the combined capital, surplus, and undivided profits. Considering the history of the bank's affairs, disclosed by the record, this breach in resources was too disastrous for it to remain solvent.

The circumstances of the failure furnish convincing proof the bank was insolvent. In the necessary division of labor in the bank, handling of the bond account and of the correspondent bank accounts was assigned to the cashier, Phil Drumm. His manipulation of those accounts made the books of the bank mere shams. He was a witness in the Richardson case, and his testimony discloses full realization and admission of himself and Richardson that the bank was insolvent. On Tuesday, June 12, Drumm was of the opinion the bank should be closed at once, but Richardson did not want to close without making an effort to reorganize. One of the directors was called into consultation, and he said the loss would be so heavy there was only one man in Wichita who could help them, and that person was Mr. Warren Brown. The condition of the bank was

discussed with Brown, and it was represented to him that the bank could get along if he would help it with five or six hundred thousand dollars. Some makeshifts to keep the bank open were discussed, but before anything could be realized from them, the fact that the vault had been looted of bonds and the bond account was paper came out. Drumm had used the assets of the bank to finance enterprises in which he and Richardson were interested, and some other enterprises. Notes had been taken for advancements to these enterprises which were not shown on the books, and loss on this paper was inevitable. On the night of June 18 Drumm made a partial statement of this paper. A meeting of the clearing house association was called. Every bank in Wichita was represented, and practically all the bankers of the city were there. Richardson and Drumm were present. The chairman of the meeting asked Drumm for a statement, and Drumm said that Robert Foulston would speak for him, or words to that effect. Foulston read to the meeting Drumm's statement, told the circumstances under which it had been obtained, stated the manner in which the outside paper had been acquired and carried, and said the loss would be from a million to a million and a half dollars. Foulston said Drumm had told him he had taken the outside paper himself, that no other officer or director of the bank knew about it, and that he assumed full responsibility for the bank's condition. Drumm's statement was discussed, and as a result of the meeting, which lasted until midnight or beyond, the bank commissioner was notified. The next morning his deputies took charge of the bank. Richardson sat through the meeting as if dazed, and when spoken to merely shook his head. When one of the bankers present said to Drumm, "Phil, I can hardly believe this is true," Drumm replied, "I have been living in hell for three years." Events like this, fraught with such tremendous consequences, do not occur to a bank that has assets whose cash value on the market would pay its liabilities. The bank was the largest in Wichita, and the largest state bank in the state except one. Its failure spelled widespread disaster, and it requires no witness to testify to the fact to enable this court to know that if the assets of the American State Bank had been tolerably intact and reasonably sound there would have been no bank failure in Wichita.

J. F. Knoblaugh was secretary of a building and loan association whose office was in the bank building. A day or two before the bank closed, Richardson said to Drumm that he did not want to see the

building and loan association go down with the bank, and wanted Drumm to arrange to protect it in some way. On June 18, which was Monday, Knoblaugh made a deposit of $4,800 in the bank. That evening he was in the bank, and asked Richardson why he had been allowed to make the deposit. Richardson replied he had told Drumm to tell Knoblaugh in the morning of the bank's condition, but Drumm did not have the nerve to do so.

Other circumstances indicating insolvency of the bank might be adverted to, but it is not necessary. The *corpus delicti*, a ruined bank, is undeniable; and the error committed by the trial court in admitting opinions that it was insolvent shrinks to such insignificance that this court must disregard it. Richardson did not testify in his own behalf at the trial, and the testimony of his associate, Phil Drumm, was abundantly sufficient, without more, to prove Richardson's knowledge of insolvency.

Assignments of error in Richardson's appeal, other than those which have been considered, may be disposed of.

The accounts of the bank with its city correspondents were reconciled after the bank commissioner took charge, according to the practice which would have been followed if the bank had remained open, and the evidence relating to method and results was properly received. The witness who testified to value of outside paper was qualified, and his testimony was properly received. The bank commissioner testified to a demand he made for certain bonds. It is asserted the testimony was improperly received because defendant was not present when the demand was made. The effect of the evidence was to show bonds had been misappropriated—a fact concerning which there was no doubt. The court instructed the jury that the value of any claim the bank might have against any other person or corporation, might be considered to swell the volume of assets. To that extent the testimony was beneficial to defendant. The evidence was hearsay, but defendant does not suggest that it had any potency, and the court is not able to pronounce it prejudicial. Testimony that the tellers who took the deposits did not know the bank was insolvent was offered under a mistaken view of the law, was not rendered important by the court's instructions to the jury, and was properly rejected.

The court instructed the jury with respect to the test of insolvency prescribed by the statute, and said:

"In applying this test to the determination as to the solvency or insolvency

of the American State Bank on June 18, 1923, you should consider whether or not the actual cash market value of its assets at said time were sufficient or insufficient to pay its liabilities, and in determining the actual cash market value of such assets you may regard the capital, surplus and undivided profits of said bank as assets of said bank if you find that the bank at said time had such assets."

Defendant requested the court to instruct the jury as follows: "But you will regard said capital, surplus and undivided profits as assets of said bank."

In the case of *State v. Myers,* 54 Kan. 206, 38 Pac. 296, the syllabus reads:

"In a criminal prosecution . . . against an officer of a bank for knowingly receiving deposits when his bank is insolvent, the capital stock and surplus fund are not to be considered as liabilities tending to show such insolvency. The capital and surplus of a bank are its resources, which may be used to pay its depositors and other creditors when there has been loss by loans or otherwise." (¶ 7.)

As a matter of bookkeeping, capital, surplus and undivided profits are classed as liabilities. Having gone into assets, assets must make them good. They are not liabilities in the same sense as liabilities to actual creditors. Neither are they funds wrapped in packages and stored in the vault, to be taken out and distributed to creditors in case of insolvency. They have no tangible existence, except as the bank has assets. Therefore, the syllabus of the Myers decision was in part inaccurate, the instruction given was framed on the correct theory, and the requested instruction was defective. The instruction given should have stated, in accordance with the syllabus of the Myers decision, that capital, surplus and undivided profits were not to be counted as liabilities in balancing assets against liabilities. Since, however, the instruction made it clear that in determining insolvency, capital, surplus and undivided profits were classifiable as assets, it will not be assumed the jury balked at placing them with assets, and insisted on putting them on the liabilities side of the balance sheet, for lack of use of the categorical imperative. In another instruction of which defendant complains the court used a permissive form of statement. The method to be pursued was so obvious it is not likely a jury with capacity to sit in the case could have been misled.

The court read to the jury the statute under which defendant was convicted. An instruction was given to the effect that, if the bank was open and receiving deposits in the ordinary course of

business, it was enough that the deposits mentioned in the informa-
tion were taken by a teller, and it was not necessary defendant
should have personally taken them, or. should have been personally
present when they were received. The instruction was introduced
·by the following:

"You are further instructed that, in determining whether the defendant
intentionally received or accepted, or permitted or connived at the receiving
or accepting of any of the alleged deposits, . . ."

Defendant had requested an instruction that the only charge on
which he was being tried was a charge of permitting and conniving
at receiving deposits. It is contended the court submitted to the
jury the question of defendant's guilt of a crime with which he was
not charged, and it is impossible to determine whether the jury
agreed on permitting and conniving, or whether part were for con-
viction for accepting and receiving, and part for permitting and
conniving. The contention is frivolous. There was no dispute about
the manner in which the bank received the deposits, no dispute about
defendant's relation to the various transactions, and no matter of
fact upon which the jury might divide.

The statute under which defendant was convicted provides for
punishment by both fine and imprisonment (R. S. 9-119, quoted at
the beginning of this opinion), and he was sentenced to pay a fine
and to be imprisoned in the penitentiary. Hard labor was not men-
tioned. R. S. 21-110 reads as follows:

"Whenever any offender is declared by law punishable, upon conviction, by
confinement and hard labor, or by imprisonment in a county jail or by fine,
or by both such fine and imprisonment, it shall not be construed to authorize
the imposition of a fine where the offender is sentenced to confinement and
hard labor."

It is contended the sentence was unauthorized. While R. S. 9-119
and R. S. 21-110 are both contained in the revision of 1923, it is
proper to consider their origins when construing them. R. S. 21-110 .
appeared among the general provisions of the crimes and punish-
ments act of 1868. The provision was not placed in the statute pre-
scribing rules for construction of statutes generally, and was inter-
pretative of the provision of ‾the 1868 code of crimes and punish-
ments only. It was designed to be read into all pertinent provisions
of that code, but modified no other laws, and of course did not bind
subsequent legislatures. R. S. 9-119 first appeared in substance in
the banking act of 1891, and was given its present form by the bank-

ing act of 1897. The question is, Did the legislatures of 1891 and 1897 have specifically in mind what is now R. S. 21-110 when enacting what is now R. S. 9-119, and intend the later act should be qualified by the former? If the provision of R. S. 21-110 was considered, it was not followed. The characteristic expression "and hard labor" was omitted. Purposeful omission of that expression would indicate the provision was not to apply to the new law. If the provision was not considered, the new law was framed just as the legislature intended, and is to be given effect accordingly. Besides that, there is reason to believe the legislature had a distinct purpose in providing that bankers convicted of fraudulent banking should be subject to both fine and imprisonment. The court is of the opinion R. S. 9-119 was designed to operate without reference to R. S. 21-110, and the sentence imposed on defendant was lawful.

Other assignments of error in Richardson's case are sufficiently covered by what has been said, or are unimportant.

Powell did not have a fair trial. Drumm was not a witness, and evidence which sealed Richardson's fate was not introduced in Powell's case. Powell's chief defense was that he did not know the bank was insolvent until after it had closed for the day on June 18, and he testified to facts which, if true, established his defense. He was corroborated in part. He was not permitted to introduce evidence which did not depend on his credibility, and which, if candidly and dispassionately considered, further corroborated him. Besides that, evidence was introduced and practices were resorted to on the part of the prosecution which were designed to prevent candid and dispassionate consideration of the evidence. Since the case is to be returned to the district court for proper trial, the evidence will not be summarized. Portions of it will be merely sketched, to show the prejudicial character of the errors committed.

For a time previous to the middle of the year 1922 the bank was a one-man bank. There were five directors, and Richardson was director, president and cashier. Drumm and Powell were clerks, with the title of assistant cashier. The bank commissioner directed Richardson to enlarge his board of directors and to distribute some of his responsibility. About July, 1922, he complied in form. He gave Powell and Drumm five shares each of his stock; they qualified as directors; Drumm took the title of cashier, and Powell took the title of vice president. Richardson continued to dominate the bank, direct its policies, and manage its affairs. Before he became a di-

rector, Powell's salary had been increased from $150 to $200 per month. Richardson would refer renewal transactions to Powell for execution, then Powell commenced to make loans, with Richardson's advice, and finally the note case gravitated to Powell's desk. Powell was also assigned the country bank accounts. After the receiver took charge, no shortages or irregularities were discovered in the departments of the bank's business supervised by Powell. The two items which broke the bank were shortage in bond account and shortage in city bank accounts. These accounts were handled by Drumm. Shortage in the city bank accounts was first discovered by the receiver after the bank closed. The evidence was insufficient to fasten knowledge of it upon anybody in the bank except Drumm. Powell's knowledge of insolvency depended on knowledge of extent of shortage in bond account.

On the morning of Tuesday, June 12, Richardson called Powell to his desk, and said Drumm had informed Richardson that Drumm had some paper in the bond account. Drumm came into the bank, said a bank examiner was in town, he had some excess paper, and he did not have bonds to cover it. Drumm said security for the paper was in preparation, and if he had a reasonable time to work it out, the loss would be only a normal loss, which he estimated at from $60,000 to $150,000. Powell said the directors ought to be called. One of the directors, Mr. R. E. Crummer, was called, and another director, Mr. J. W. Clendennin, came in. Mr. Crummer said they ought to have a definite statement of the outside paper, and it was agreed Drumm should make such a statement. Richardson and Crummer were to confer further with Drumm. The bank examiner proved to be a national and not a state bank examiner, and tension relaxed. The next day Richardson assured Powell affairs were in much better condition than they had supposed, good security for the outside paper was forthcoming, and Drumm was preparing a statement, which could not be made instanter, but which would be ready in a day or two. Thursday and Friday went by, and the bank closed at one o'clock on Saturday afternoon. Powell had become restive, and after the closing hour he and Clendennin consulted Powell's attorney, Mr. Robert Foulston, and were advised respecting the liabilities of bank officers. Powell and Clendennin interviewed Richardson at his house, and arranged for a meeting at Foulston's office that night, which was attended by Richardson, Drumm, Clendennin and Powell. Drumm told of handling outside paper by means of

bond account, and fixed the amount at approximately $400,000. The entire situation was discussed in detail, and if Drumm was telling the truth the bank was not only not insolvent, but its capital was not impaired. At that conference, however, Powell told Richardson and Drumm he thought the outside paper ought to be in the note case, and unless that paper was on his desk Monday he would not be at the bank. On Sunday Drumm was busy in the bank, presumably getting his paper together. About eleven o'clock on Monday, June 18, Drumm placed a bundle of notes on Powell's desk. Powell was not able to canvass the bundle until after the bank closed for the day. The bundle contained notes to the amount of about $500,000, instead of $400,000. Powell became suspicious, consulted Crummer, and ascertained that the Brown-Crummer Company had no bonds in the bank. Powell consulted his attorney, and about 8:30 in the evening discovered Richardson and Drumm in the bank. Powell went in, and, prompted by the information he had obtained from Crummer, asked Drumm about the bonds which were supposed to be in the vault. Drumm said some of the bonds were in Kansas City, some were in St. Louis, and some were in New York. Powell said, "You don't mean the whole account has been shipped out?" Drumm said, "Well, to make the account balance I would have to transfer it." Powell said he did not care anything about a transfer; he wanted to know where the bonds were. Drumm then said the whole bond account was made up of paper. Richardson fell back in his chair and said, "My God, man, what have you done with the money?" Following Drumm's disclosure events moved swiftly. Drumm went to Foulston's office to make a statement, and would have made a full statement, but was restrained from doing so by his attorney. Instead he made a list of outside paper, which became known at the trial as exhibit No. 281, a copy of which reads as follows:

"Federal Refining Company...... $225,000  N. G.
Frontier Refining Company...... 140,000  Small shrink.
Kans. Gas & Pet. et al.......... 560,000  Loss about $200,000.
E. L. Coleman .................. 210,000  Good.
J. A. Tobin .................... 20,000  Loss $10,000.
J. M. Reynolds et al............ 28,000  Loss $28,000.
Earl Fisher .................... 105,000  Loss $100,000.
Miscellaneous .................. 120,000  Loss $50,000."

Powell went to Crummer's house, and Crummer and Powell went to the home of Warren Brown. C. Q. Chandler and Charles W.

Carey were there. They had met with Brown to discuss purchase of the American State Bank. The selling price of a bank is its capital, surplus and undivided profits, plus five per cent of its non-interest-bearing deposits, plus two and one-half per cent of its interest-bearing deposits. They were ready to buy the bank on these terms, if its assets were sound. Powell and Crummer arrived between ten and eleven o'clock, and Powell announced Drumm's confession of shortage in the bond account. Carey said if that was the situation, there was no possibility of their purchasing the bank. The subject was discussed further, and the clearing-house meeting was called. Some of the proceedings of the clearing-house meeting were proved in Richardson's case, and have been recited. The condition of the bank was fully discussed, and the conclusion was obvious it could not open the next morning. Members of the clearing-house association were concerned with respect to what should appear in the newspapers. It was stated this was not a bank failure; it was a straight-out defalcation by a bank officer; and a committee was appointed to see that the newspapers were given the whole story, and that it was given to them correctly. Drumm's attorney went with him from Foulston's office to the meeting, which, in classic drama, would be the last scene of the fifth act, in which the villain is unmasked.

The court was willing to admit exhibit 281, but not the circumstances connected with its preparation. The fact that Powell went to Brown's house was admitted, but what occurred there was excluded. The fact that a clearing-house association meeting was held was admitted, but practically everything that occurred there was excluded. While the paper charge against Powell was that he permitted deposits to be received while he knew the bank was insolvent, the trial took the form, on the state's side, of a trial for robbing a bank. The events of the afternoon and night of June 18, including what occurred at Foulston's office when exhibit 281 was written, and including what occurred at Brown's house, tended strongly to prove that Drumm not only wrecked the bank, but kept Powell, Clendennin, Crummer, and even Richardson, in ignorance of the fact he had reduced it to insolvency, until that night. The events concatenated to form one episode, ending with the *denouement* at the clearing-house meeting, and Powell should have been permitted to prove them.

The state's evidence that Powell knew the bank was insolvent

during business hours on June 18 was circumstantial. Most of the circumstances were unrelated to each other, many were remote, some were trifling, some had no probative value at all, but might be depended on to arouse suspicion of the uncritical, and some damaging proof was not founded on fact. The rejected evidence might very well have created a reasonable doubt of guilt, and the error committed in rejecting it was prejudicial.

There was evidence tending to prove that Powell had business ability which was by no means fully expended in earning $200 per month in the bank. Powell was asked on cross-examination to identify photographs of his home. His attorney said if the matter were material, he would invite the court and the jury to look at the house, inside and out. The following then occurred:

"THE COURT: We will take care of it at the proper time.

"MR. AMIDON: I want to offer the picture of the house in evidence.

"MR. FOULSTON: I object to it as incompetent, irrelevant and immaterial, and not tending to prove any issue in the case.

"THE COURT: It will be overruled.

"Q. That is a picture of the house, isn't it? A. Yes, it is.

"MR. FOULSTON: I don't understand. Is this man charged with having a home?

"MR. AMIDON: But if he can get this kind of a home on two hundred dollars a month, I want to know how he does it.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"MR. AMIDON: Offer them both in evidence.

"MR. FOULSTON: To which we object as incompetent, irrelevant and immaterial and prejudicial, and offered for no other purpose than to inject an element of prejudice into the matter.

"MR. AMIDON: Not offered for that purpose at all.

"MR. FOULSTON: It couldn't be offered any other way.

"THE COURT: The objection is overruled."

Afterwards the court, over the objection of defendant, sent the jury out to inspect Powell's house and grounds, under this instruction:

"The purpose of a view, as contemplated by the law, is that the jury may see for themselves the natural and fixed conditions surrounding the object or thing viewed."

Therefore, the jury were to determine, from sight of the fixed conditions surrounding Powell's home, whether the bank was insolvent and whether Powell knew it was insolvent. The foundation for some such proceeding was laid when the complaint was drawn. The bank had deposits of about four million dollars.

State v. Powell.

Those selected to be proved at the trial were small in amount, but large in sentimental value to the state. One was a small sum of Sunday school money. A mother sent her daughter to the bank with $33. A wife deposited for herself and her hubsand, a part of the money being provided by the wife's mother, an elderly lady who was present when her daughter testified. The widow's mite was not overlooked. A depositor who was a widow was asked if she were married. She said no, she had been married, but her husband was dead, and she was running a rooming and boarding house.

In his closing argument to the jury the attorney who managed the prosecution stated the issue in the case, and applied the evidence in the case to that issue, as follows:

"Now, gentlemen, there is just one thing in this case, just one thing: Is there one law for the rich, and another for the poor? Does the poor, lowly depositor have no right, and the rich banker run the country? Have we arrived at that stage in the history of the American republic? If we have, then the Goddess of Justice that stands at the front door of this courthouse does not mean what it says when they blindfold her eyes and say she cannot see whether the man or woman that is appearing before her is rich or poor. I had noticed the other day, when a bank president walked in, my friend Foulston said, 'Have a chair; here is a chair; I will get you a chair.' My God, suppose it had been a section foreman [juror] that walked in; they would have said, hunt a door some place. We all know it. What is this country coming to, when the rich are trying to run it and the poor citizen has no chance? If I remember rightly, the Good Book tells us that it is harder for a camel to pass through the eye of a needle than for the rich man to enter the kingdom of heaven. . . .

"What will it profit you, Mr. Powell, if you live in a mansion? What will it profit you if you gain the whole world and lose your own soul? What good will it do you?

"Say that Powell is a wonderful man, if you want to; that he sprung from a poor farmer's boy; climbed up the ladder—so did Eddie Adams [a notorious bank robber]. So did Eddie Adams spring from the poor farmer's boy and climb up the ladder. The only difference between the two is this: Eddie Adams showed some personal bravery, and Powell has not shown any, because he has robbed those that trusted him. That is the only difference. I admire a man that has got the nerve to go into a bank and blow the safe and take a chance on his own life. He has some bravery. But the man that will say to you, Mr. Harbor—to you, Mr. Hunter, 'Deposit your money in the bank; it is perfectly safe,' and then close the bank—

.   .   .   .   .   .   .   .   .   .   .   .   .

"The home is exempt. No matter if it is worth fifty thousand dollars, nobody can touch it. Isn't it a little peculiar? I have not seen the house; that may be a good picture of it, or may not, I don't know, but I do know this, that John Knoblaugh is an honest man, and John Knoblaugh swears it is

worth twenty thousand dollars. He swears it is worth that, and I do know this: Powell has been too thrifty as a director and vice president of that bank, when the bank was slipping all the time, Powell making money—his bank gone broke."

It is said defendant's attorneys did not object to this diatribe, fairly characteristic of the closing argument to the jury, when it was delivered. In the case of *State v. Gutekunst*, 24 Kan. 252, the court said:

"We take this opportunity, however, of calling attention to the duty of the district courts in jury trials, to interfere in all cases of their own motion, where counsel forget themselves so far as to exceed the limits of professional freedom of discussion. Where counsel refers to pertinent facts not before the jury, or appeals to prejudices foreign to the case, it is the duty of the court to stop him then and there. The court need not and ought not to wait to hear objection from opposing counsel. The dignity of the court, the decorum of the trial, the interest of truth and justice forbid license of speech in arguments to jurors outside of the proper scope of professional discussion." (p. 254.)

In this instance the defendant had no ground upon which to base an objection, for the court had opened the way for the proceeding to become nonjudicial. The argument was based upon evidence the court had admitted over defendant's protest, and was consonant with the stated theory upon which the evidence was offered. It would impugn the talent of the distinguished attorney who represented the state to say he did not correctly measure his jury, or failed to arouse the passionate resentment against defendant which his philippic was intended to excite. Indeed, the distress caused by a bank failure is so poignant it needs no adventitious aid to create a thirst for vengeance. It was the duty of the prosecuting officer and of the court to see to it the mob spirit was not fomented.

Error of the court in excluding testimony relating to the circumstances under which the bank closed was intensified by instructions given the jury.

The court read to the jury the provision of the banking act permitting a bank to place its affairs in the hands of the bank commissioner by posting on its front door the notice, "This bank is in the hands of the state bank commissioner." There is no evidence in the abstract or counter abstract that the bank placed any such notice on its front door. In the state's brief it is said the instruction was based on the bank commissioner's testimony. The bank commissioner testified he was notified of the bank's condition by Mr. Foulston early in the morning of June 19, and had a deputy in

Wichita by nine o'clock. The deputy testified he arrived at the bank between 8:30 and 9 a. m. June 19. It is likely the public was advised by notice on the door that the bank was in the hands of the bank commissioner. Having excluded the evidence showing that notification of the bank commissioner was one of the results of the clearing-house meeting, the court instructed the jury that, if the directors caused such a notice to be posted, they might consider the fact as tending to prove Powell's knowledge of insolvency. In two instructions the jury were advised it was immaterial who caused the bank's insolvency, if it was insolvent, without qualification allowing the defense that Drumm secretly caused the insolvency, if such were the case, to be considered.

Instructions were given on the theory Powell had it in his immediate power to prevent reception of deposits by the bank, and was charged with the responsibility of determining at just what stage of the bank's embarrassment effort to preserve it as a going concern should be abandoned. The statute penalizes an officer who permits a bank to receive deposits when he knows it is insolvent; and it should be noted here that the knowledge referred to is knowledge in fact, and not knowledge imputable from negligent failure to know. (*State v. Tomblin,* 57 Kan. 841, 48 Pac. 144.) Under the by-laws of the bank, Powell took the president's place in case of the president's absence or disability. He was not in fact in general control of the bank, he had no authority to decide when the bank ought to be closed, and he had no authority to close the bank if he decided it ought to be closed. Under the circumstances of this case, Richardson, as manager in fact, doubtless could have closed the bank. The board of directors had authority to close it. But Powell had no direct or immediate authority over that subject. All he could legally do to prevent reception of deposits was to appeal successfully to Richardson or the board of directors, or to secure intervention of the bank commissioner.

This bank was examined on March 21, 22, 23 and 24, 1922, by Deputy Bank Commissioner Bowman and two assistants, and was examined at the same time by the manager and examiner of the Wichita clearing house and his assistants. Bowman's confidential report to the bank commissioner stated, "They know and feel they have been examined." Following that examination, criticism by the bank commissioner of the business methods of the bank was the

subject of correspondence and personal interview. In November, 1922, the bank was again examined by Bowman and the manager of the clearing house, and their assistants. The bank commissioner took charge of the bank June 19, 1923. The Powell trial commenced May 1, 1924. The state's evidence, both in Richardson's case and in Powell's case, established the fact the bank would have been solvent if the bonds shown by the books had been in the vault and if the money shown by the books had been on deposit subject to check in the city correspondent banks. If the officers of the American State Bank had been continually looting it, they still had a sound bank to pluck, except for those two items. The bank examiner, as a part of his examination, checked the accounts with the correspondent banks and ascertained that those accounts were correct. Whenever misappropriation of bonds commenced, there was no proof that it commenced before March, 1922. Doubtless within the ten and a half months the receiver was in charge before the Powell trial commenced, sources of proof were exhausted. The result is, the state's case does not antedate March, 1922, except perhaps for matters purely introductory and explanatory. The issues are simple, the evidence at another trial should be confined to the issues, and the jury should be instructed according to the case then presented.

In view of the foregoing, it is not deemed necessary to pursue further the numerous assignments of error in Powell's case.

The judgment of the district court in Richardson's case is affirmed. The judgment in Powell's case is reversed, and the cause is remanded for a new trial.