No. 28,807.

The State of Kansas, *Appellee,* v. S. O. Netherton, *Appellant.*

(279 Pac. 19.)

Opinion
filed July 6, 1929.

*Charles W. Gorsuch, Chauncey B. Little, Judson S. West,* all of Olathe, *Frank M. Sheridan, Bernard L. Sheridan,* both of Paola, and *Jerome S. Koehler,* of Kansas City, for the appellant.

*William A. Smith,* attorney-general, *Howard E. Payne,* county attorney, *H. L. Burgess* and *S. T. Seaton,* both of Olathe, for the appellee.

The opinion of the court was delivered by

HUTCHISON, J.: This is an appeal from a conviction of murder in the first degree, where the proof consisted entirely of circumstantial evidence. The defendant is a physician, fifty-nine years of age, who had acquired prominence in the vicinity where he had resided for many years and was connected with a number of organizations. He was charged with having killed his wife, who was much younger than he and possessed of quite an inheritance from her mother, lately deceased. He reported to the sheriff about noon on February 24, 1928, that he had found his wife dead in the basement or cellar of their home. The sheriff and others came and found her there with two bullet wounds in her head from a twenty-five caliber automatic revolver. Bloodhounds were used in the case, and testimony was introduced in the trial concerning them, their actions and movements. There was evidence as to the length of time the deceased must have been dead before the sheriff and others saw her; also concerning there being ugly tramps in the neighborhood about that time and one at the house, and as to burglary and disarrangement of the contents of bureau drawers and of other things in the house. The motive ascribed was to become possessed of part of her estate in his own right.

After the funeral he was taken by the sheriff and county at-

torney to Kansas City, Kan., and there interrogated at great length, at the conclusion of which he dictated and signed a statement covering all the things about which he was interrogated. Such statement was not used in evidence.

The trial was had in the county of his own residence, and lasted nearly a week. On the motion for new trial many questions were raised and evidence, by affidavit and otherwise, was introduced along many lines for the purpose of showing error and obtaining a new trial. The state also produced many affidavits and other evidence to confute the evidence of the defendant. The motion for new trial was overruled and the defendant sentenced, from all of which this appeal is taken.

The appellant urges that it was error to refuse the admission of the statement made by defendant, as a part of the cross-examination of Sheriff Carroll, who related parts of the conversation leading up to the making of the statement. If the statement was a separate and distinct matter and no part of the conversation related by the sheriff, the ruling was right; and the state in its brief so treats and considers it.

The sheriff in his testimony relates the taking of the defendant with him in his automobile to Kansas City, Kan., about four o'clock Sunday afternoon after the funeral of the wife that day. He further stated that he took him first to the police station and he and others conversed with him there that night until ten or eleven o'clock; that these conversations continued daily until Wednesday or Thursday following, either in the police station or in the office of the county attorney of Wyandotte county, during all of which time he kept the defendant confined in the jail. The sheriff named the persons who were present at these different conversations during these four or five days. They were the county attorney and court reporter of Johnson county, the county attorney of Wyandotte county and one of his assistants, the city detective of Kansas City, Kan., and the chief of police of Kansas City, Kan.; also the coroner of Johnson county part of the time. They all talked with the defendant about the tragedy. He, the sheriff, talked with him "pretty much." On the evening of the last day of this extended interview, the sheriff said, there were six present, including himself, in the county attorney's office. Defendant did most of the talking. He answered all questions asked him. They were all present when he made the written statement. The sheriff wasn't in the room

where the defendant was when he made the statement—was in the other room—but the door was open and he heard the defendant dictate certain parts of it. The statement contained three or four solid typewritten pages. The defendant signed the statement in the presence of the sheriff and others.

The sheriff was the first witness called by the state, and the above is part of what he said with reference to the conversation and the statement, as it is called. The statement in question begins as follows:

"Statement of S. O. Netherton, taken in the office of the county attorney of Wyandotte county, Kansas, at Kansas City, Kansas, February 28, 1928, at 7 o'clock p. m., and transcribed by Jas. G. Manning as dictated, and contemporaneous therewith. Present: Howard Payne, county attorney, Johnson county, Kansas; E. G. Carroll, sheriff, Johnson county, Kansas; Wm. McMullen, chief of police of Kansas City, Kansas; Joseph Downs, detective; and Arthur Mellott, county attorney of Wyandotte county, Kansas."

This is followed by an admonition as follows:

"It is my duty to advise you that we are about to take your statement in connection with the murder February 24, 1928, of your wife, Edith Netherton. You don't have to answer the questions that may be asked you nor make any statement whatever unless you desire to do so, and any statements that you do make may be used against you. However, you may, if you desire, tell us all that you know about the murder of your wife."

The statement then contains the following three questions, which were answered: "State your name"; "Where do you live?" "Now you just tell him, Mr. Netherton, from the beginning whatever statement you want to tell." The record does not disclose who gave the admonition or who asked these three questions. The next question contained in the statement was asked by Mr. Payne, county attorney of Johnson county. The next eleven questions were asked by Mr. Mellott, county attorney of Wyandotte county, and one other later on. County Attorney Payne asked one other question later on, and there are eleven other questions asked the defendant where the record is silent as to who propounded them. All the questions were answered, and no statement was made by the defendant except in response to a question. One of the questions asked was as follows:

"You expressed this afternoon a theory as to how and under what circumstances you think your wife met her death. I would like to have you give your theory again if you will."

Another of the questions asked begins as follows:

"I believe you stated earlier in your statement, and also orally to us, that . . ."

Another:

"Well, this may be repetition, but let me ask you. . . ."

This constitutes the statement in question. Was it a statement of the defendant separate and apart from the conversation that had been in progress for four or five days, or was it the concluding and culminating part of that conversation described by the sheriff—a sort of summary of such extended conversation? If it was a part of the conversation it should have been admitted upon the request of the defendant as a part of the cross-examination of the sheriff. It was most certainly a part of the conversation which continued for four or five days along the same line, as shown by reference to what was said shortly prior, and by indicating that a question was a repetition of a former question. This last part was no different from what had been going on at the same place and between the same parties for many days. The only difference is that the court reporter took down or typed this concluding part of a long, drawn-out conversation. A comparison of the questions and answers contained in the statement shows most of it to be along the same line and substantially the same as the conversation related by the sheriff, and none of it to be on different or irrelevant subjects. Under these circumstances the statement must be held to be a part of the same conversation which the sheriff related, and it was error for the court to refuse to admit it upon request of the defendant as part of the cross-examination of the sheriff.

"The general phrasing of the principle, then, is that when any part of an oral statement has been put in evidence by one party, the opponent may afterwards (on cross-examination or reëxamination) put in the remainder of what was said on the same subject at the same time." (4 Wigmore on Evidence, 2d ed., § 2115.)

"Where the prosecution in a criminal case introduces evidence showing a portion of a certain conversation had between the defendant and a third person, the defendant may introduce evidence showing the rest of such conversation." (*State v. Brown,* 21 Kan. 38, syl. ¶ 5.)

"It is true that part of the remark was self-serving, but it was a part of one statement, offered we must presume as an admission tending to prove guilt, and must be considered as a whole and its effect left to the jury." (*State v. Truskett,* 85 Kan. 804, 816, 118 Pac. 1047. See, also, *Davis v. McCrocklin,* 34 Kan. 218, 222, 8 Pac. 196.)

Another specification of error is in refusing the request of the

defendant to keep the jury together in charge of a bailiff during the progress of the trial to prevent the members thereof from mingling with the crowd. The record does not show any request for such an order at the commencement of the trial, but on the third or fourth day of the trial the defendant requested the discharge of the jury because of a newspaper article appearing in a paper of general circulation in the county, commenting on the evidence of the previous day to the undoubted prejudice of the defendant, and in connection with such request stated that a request had been made early in the trial for the jury to be kept together, which had been denied. Whether this statement was literally correct or not, the matter was unmistakably brought to the attention of the court by such statement, and the failure of the court to grant or consider the matter at that time after such statement is equivalent to a refusal to grant it at that time.

It is urged by the appellant that the prejudice and bitter feeling against the defendant had become quite pronounced and manifest in and around the courthouse and in the town and county. On the motion for new trial nearly sixty affidavits of prominent citizens of the county were filed, showing the existence of a very high state of prejudice and feeling against the defendant. On the other hand, about seventy of probably the same class of citizens furnished affidavits denying any feeling of prejudice or bitterness against the defendant in the county, but stating that a number of the people of the county expressed the opinion that defendant was guilty, but they "did not pretend to know the facts except from newspaper reports, street talk and neighborhood gossip."

Three questions asked the defendant by the county attorney in cross-examination indicate that the county attorney and sheriff, on the day of the funeral, when they took defendant to Kansas City, must have thought there was a high and dangerous state of feeling against the defendant. They were as follows: "Do you know why we took you to Kansas City?" "Don't you know, as a matter of fact, it was to protect your own life?" "We took you down there for your own personal protection."

The court admonished the crowd in the court room a number of times during the trial because of their disturbing the proceedings. In his closing argument to the jury the county attorney said:

"Then you will be able to understand why the public in Johnson county became so inflamed that we had to take him to Kansas City to save his life.

And I want you to understand, gentlemen of the jury, that the public knows Doctor Netherton is guilty, and they don't base their assumption upon the testimony of bloodhounds. It is just some more of the circumstances I am going to tell you about before I have finished that will explain why the public of Johnson county became inflamed against this doctor. . . .

"Let's take his story and see if this public that believes Doctor Netherton was guilty of committing this crime were very far off this guess when they thought that. . . .

"What did he do? Take his own version of it, and let's see if the public of Johnson county weren't righteously inflamed at this man. . . .

"Then I ask you, did Mr. Carroll and myself, in spite of all these facts, have to start on a campaign to inflame the public against this man?"

Three affidavits filed in the case show that after the verdict and the giving of a bond the trial judge and other court officials in the sheriff's office "advised the defendant it was not safe to remain at home for fear of mob violence, and asked that he arrange things so that he could be absent until the ill feeling had time to abate."

In Kansas the matter of permitting or refusing the jury in a criminal case to separate after being impaneled is largely in the discretion of the court, and a reviewing court would hesitate to make what might appear to be an abuse of that discretion the sole reason for a reversal. And while the court would be reluctant to set aside a verdict where the discretion of the court is usually intended to control, yet we cannot well sanction a verdict in a murder case surrounded with so many opportunities for improper influences and where the jury is for so long a time before it retires for deliberation exposed to an atmosphere charged with what the trial judge, county attorney and so many others, perhaps through a superabundance of caution, deem to be a dangerously prejudicial and bitter feeling.

"We cannot be too strict in guarding trials by jury from improper influences, and in compelling a rigid and vigilant observance of all the provisions of the statutes tending to preserve the purity of such trials. The verdict, when returned into court, must command entire confidence. It must be secure from all improper bias, and even from the suspicion of improper bias." (State v. Snyder, 20 Kan. 306, 310.)

"In our state the law allows a separation of the jury, with the permission and under proper admonition of the court, until a final submission of the case. There are cases where the court in its discretion may well order the jury to be kept together, and away from the excitement and prejudices of the community, from the beginning of the trial. If there is danger that the enemies or friends of the accused will endeavor to reach and influence the jury, or that the jurors, in commingling with the public during the trial, will be exposed to improper extraneous influences or be affected by the passions and prejudices

existing outside the court room, it is the duty of the court to keep the jury together under the restraining supervision of an officer and beyond the reach of the outside parties and influences. . . . It is the aim of the law to surround a trial by such safeguards as will exclude all external and improper influences from the jury, and thus protect the rights of the defendant." (*State v. Burton,* 65 Kan. 704, 706, 708, 70 Pac. 640.)

The inquiry is pertinently made why a request for a change of venue was not made on account of this claimed state of feeling and prejudice. The answer made by the defendant and his local counsel is reasonable when they say they did not observe or even suspect such a condition until along in the progress of the trial. Of course, they would naturally be the last to see, hear or learn of it. We are all slow to realize or believe our friends and neighbors have turned against us. Our question now is whether or not the court on the third or fourth day of the trial, when his attention was called to this request to keep the jury together, should have ordered them kept together as a wise and prudent matter of precaution. The court may not have known at that time all the county attorney did about the highly inflamed public mind of Johnson county, but he knew from what the record shows had already transpired in the proceedings that the case was quite an unusual one, and the newspaper incident that had just occurred was in itself quite sufficient to justify the exercise of his discretion as a wise precaution to prevent the jury from being influenced by such adverse and detrimental comment upon the testimony of the defendant. This is not like a request for a change of venue, which should be granted only upon a showing, but this should be granted unhesitatingly as a precautionary measure, even if the apparent reason for it is very slight, in order to preserve and maintain universal respect for the results of criminal trials and prevent as far as humanly possible local prejudice and extraneous influence from reaching the jury. We think, under all the circumstances of this case, the request to keep the jury together should have been granted when the attention of the court was directed to the matter on the third or fourth day of the trial, and the failure to do so when requested amounts to an abuse of discretion.

Appellant urges there was misconduct of the county attorney in the closing argument to the jury with reference to a number of statements made by him in addition to those above mentioned. Our attention has been directed especially to the following:

"There is one question that is involved in this matter to-day. That question, gentlemen of the jury, is, Can a Johnson county jury convict a man accused of murder when that man is worth one hundred thousand dollars?" (This statement was repeated.)

"The state hasn't been able to refute this because witnesses are afraid to come here and testify. . . . There are witnesses that would have been a benefit to the state of Kansas, but I couldn't get them to come here." (Also much more on the same subject.)

"Who else? Who else, gentlemen, who else? Who else could have committed this act but this doctor?" (A similar statement was made six other times.)

"Don't you suppose this $5,000 defense would have had these witnesses here to testify that there was somebody on that premises that morning besides the doctor himself?"

"But I knew he was guilty, and I know it to-day, but I ask you, just like I asked myself at that time and just like Mr. Carroll asked himself at that time, If not, who? If not, who? Then, who else? Gentlemen of the jury, take this case by the process of exclusion. . . .

"As God is my witness, as God is Mr. Carroll's witness, this doctor here didn't tell us a thing about handling any drawer in that house until after the finger print experts came here."

Three of these remarks might be grouped with those heretofore quoted from this argument in connection with the prejudice and feeling of the people of the county, and no further comment is necessary concerning them. The comment as to the inability to get the witnesses to testify and tell what they knew, would naturally leave the impression that there was good testimony on the questions involved which the state failed to produce because of the indisposition of the people of the county to help with the case. An affidavit showing diligence and asking a continuance with prospect of getting the witness later, and setting up the facts such witness will state when procured as a witness, is proper under certain circumstances, but these things cannot be shown in the argument of counsel to the jury. More than one place the county attorney gives positive testimony without being sworn. The "who else" or exclusion argument is certainly calling for the defendant to clear himself by pointing out another on whom the guilt can be placed. The defendant has no such obligation. He stands as perfectly innocent in the sight of the law until his guilt is established, and the fact that he fails, declines, or even refuses, to suggest the party, or a party, who might reasonably be considered guilty does not by the process of exclusion or any other process point to his guilt, and if that meaning could be taken from such repeated remarks it was error.

The appellee insists that no proper or timely objection was made to these remarks so the court could have cared for any objectional feature therein. There is a confusion as to this part of the procedure, but if we accept the alternative as stated in the counter abstract of the state we think the court still had a real duty to perform in connection with the objection and should have warned the jury against any improper statements. The counter abstract shows that at the close of the argument in question the court directed the jury to retire to their jury room, and after the jury had retired the attorneys for defendant presented the following to the court:

"We want to object and except to the conduct of the county attorney in the closing argument of this case as misconduct on his part by referring to matters not in evidence, and to the statement made to him and other parties. His reference to the fact the defendant is a wealthy man and his reference to public sentiment being against him, and that the public knew he was guilty; all of this as misconduct on the part of the state, and we ask that the jury be instructed to disregard it."

That objection was overruled.

It appears that no interruption was made by objecting during the argument. Some courts hold such interruption to be necessary to reserve the question. Our court has not so held. Appellant claims that under the decision in *State v. Powell*, 120 Kan. 772, 245 Pac. 128, no objection is necessary. The court did say no objection was necessary, in that case, because the court by an adverse ruling on the admission of testimony made a further objection unnecessary and useless. The comment was upon evidence the court had over objection admitted. But the court did in that case quote approvingly from the opinion in the case of *State v. Gutekunst*, 24 Kan. 252, as follows:

" 'We take this opportunity, however, of calling attention to the duty of the district courts in jury trials, to interfere in all cases of their own motion, where counsel forget themselves so far as to exceed the limits of professional freedom of discussion. Where counsel refers to pertinent facts not before the jury, or appeals to prejudices foreign to the case, it is the duty of the court to stop him then and there. The court need not and ought not to wait to hear objection from opposing counsel. The dignity of the court, the decorum of the trial, the interest of truth and justice forbid license of speech in argument to jurors outside of the proper scope of professional discussion.' (p. 254.)" (p. 800.)

After this reference the opinion in the Powell case states:

"In this instance the defendant had no ground upon which to base an objection, for the court had opened the way for the proceeding to become non-

judicial. The argument was based upon evidence the court had admitted over defendant's protest, and was consonant with the stated theory upon which the evidence was offered. It would impugn the talent of the distinguished attorney who represented the state to say he did not correctly meàsure his jury, or failed to arouse the passionate resentment against defendant which his philippic was intended to excite. Indeed, the distress caused by a bank failure is so poignant it needs no adventitious aid to create a thirst for vengeance. It was the duty of the prosecuting officer and of the court to see to it the mob spirit was not fomented." (p. 800.)

In the case of *State v. Vandruff*, 125 Kan. 496, 264 Pac. 1060, the rule announced in the Powell case was said not to apply for very good and pertinent reasons.

"This cannot be said here, and the reason given in *State v. Powell*, supra, for the lack of necessity of calling the attention of the court to what was claimed to be an improper argument, does not apply. Since the trial court heard the argument and had his own recollection and judgment as to what had been said, and the language complained of was not taken by the reporter so we might know what was said, and the interpretation placed upon it by defendant in his affidavit was controverted in a general way by several affidavits, it may well be that the court did not find it to be true that counsel in his argument made all of the statements charged to him by defendant in his affidavit, or make any statements that were seriously out of the way, or as amounting to misconduct." (p. 505.)

Appellee cites a number of recent cases as to the necessity of making an objection promptly in order that the point may be reviewed. In *State v. Messmer*, 123 Kan. 201, 254 Pac. 378, it appears that no objection or request was made on this subject at any time. In *State v. Ragan*, 123 Kan. 399, 256 Pac. 169, the court said in the opinion:

"The state contends that if the statements could have been considered prejudicial, the same were removable by a proper instruction of the court if requested by the defendant, from which we understand no objection was made to the alleged prejudicial statements." (p. 402.)

In the case of *State v. Fadler*, 126 Kan. 664, 271 Pac. 283, this court declined to review the matter because the defendant took no exception to the remarks at the time they were made and did not call the attention of the court thereto until the filing of a motion for a new trial. In a very recent case, *State v. Woodman*, 127 Kan. 166, 272 Pac. 132, the court declined to review the alleged error of misconduct because no objection or request of any kind was made at any time in respect thereto, not even upon the motion for new trial. The argument in this case was taken down by the court re-

porter and is certified in the abstract here. The request was made as the jury retired—not then too late to correct the mistakes. If these remarks were improper—and at least some of them were—the trial court could very easily have endeavored to remedy the error by a special admonition to the jury to disregard such remarks as in his judgment should not have been made, even if the jurors had gone outside of the court room when the request was made. He was not powerless to have them returned for an appropriate admonition. The fact that in the general instructions to the jury there was included one limiting their consideration of evidence to that which they had heard from witnesses on the stand will not cure the omission. There should have been something definitely directed to the questionable remarks.

Appellee pleads justification on the ground of provocation by the remarks of the attorneys for the defendant. This has sometimes been recognized as a legitimate excuse, even in a criminal case, for some rash, extravagant, inflammatory, or prejudicial remarks in a sudden outburst of retaliation, but hardly for an extended repetition or a series of objectionable statements along several different lines. We think the failure of the court to admonish the jury to disregard these remarks was error, even if the jury had retired from the room before the request was made.

The motion of the defendant for a new trial should have been granted on account of the three errors herein discussed at length.

The judgment is reversed and the cause is remanded with instructions to grant the defendant a new trial.