No. 29,759.

THE STATE OF KANSAS, *Appellee*, v. S. O. NETHERTON, *Appellant*.

(3 P. 2d 495.)

Opinion filed October 10, 1931.

*C. W. Gorsuch, Chauncey B. Little, Judson S. West,* all of Olathe, *Frank M. Sheridan, Bernard L. Sheridan,* both of Paola, and *L. H. Menger,* of Lawrence, for the appellant.

*Roland Boynton,* attorney-general, *Clayton Brenner,* county attorney, and *S. T. Seaton,* of Olathe, for the appellee.

The opinion of the court was delivered by

SLOAN, J.: The defendant was convicted of the murder of his wife, Edith Netherton, and from the judgment of conviction he appeals.

This is the second appearance this case has made in this court. (*State v. Netherton,* 128 Kan. 564, 279 Pac. 19.) The principal contention of the appellant is that the evidence is insufficient to sustain the verdict, and for this reason it is necessary for us to examine the evidence to determine whether there is substantial evidence supporting the verdict. The evidence was entirely circumstantial. The appellant had lived on a small farm near Olathe for about twenty years. Prior to locating on this farm he had received a col-

legiate and medical education, had practiced his profession in three states and had been a ship surgeon for several years on a vessel service between the Asiatic ports and those of our western coast. When he came to Olathe he had about $8,000 in money and securities with which he purchased a small farm, abandoned the practice of medicine and engaged in horticulture. Some time after his location on the farm he met and courted Edith Strahl, who was the daughter of a widow with considerable property, living near the appellant's farm. They were married about ten years prior to the tragedy under consideration. She was at that time twenty-one years of age and he was forty-nine. She was a graduate of the high school of Olathe, had attended the Kansas university and was for a time employed in a bank at Olathe. The evidence indicates that she had a distaste for society and fine clothes, but was interested in horticulture. After their marriage they lived on appellant's farm and in about two years a daughter, Dorothy, was born, and at the time of the death of Mrs. Netherton she was about to become the mother of another child.

The mother of Edith Netherton died in 1926, leaving as her only heir her daughter, whose heritage consisted of a farm of 160 acres and about $80,000 in bonds and other securities. The appellant and his wife were frugal and industrious and devoted their time and attention to their farms, and at the time of the tragedy the appellant had bonds in the amount of $34,500, the deceased bonds in the amount of $44,000, and $20,000 in bonds had been set apart for the use and benefit of the daughter, Dorothy.

The evidence of the neighbors is to the effect that the relation between the appellant and his wife was always courteous and attentive, and they were apparently devoted to each other. Hiram Morgan had worked for Mrs. Strahl several years before her death, and after her death he was employed by the appellant and was a member of the family.

On the morning of February 24, 1928, the family arose as usual, ate breakfast and did the chores about the place. The appellant took Hiram Morgan to the farm belonging to Mrs. Netherton for the purpose of looking after the live stock. He returned to the home about 8:30, just as Dorothy was getting ready to start for school. The school was about a mile from the home and she took her lunch with her. The appellant went to town, transacting business at the bank and other places, and returned home about 11:30.

He called the sheriff, telling him that the house had been robbed. In about five minutes he again called the sheriff and told him he had found his wife dead in the basement. The sheriff went immediately to the house. The appellant was in the yard and accompanied him to the basement, where he found the body of Edith Netherton lying on her stomach, her head resting on the right side of her face. There were two gunshot wounds, one in the back of the head and one in the left temple, from a .25 caliber automatic revolver. A stool stood near the feet of the body and at a little bench with some berry boxes on it—one berry box partly finished. Shortly after the sheriff arrived John Wells came, and within a few minutes the coroner, Doctor Moberly, arrived. Doctor Jones, of Olathe, hearing of the tragedy, called the appellant and asked if he could be of any assistance. He came to the residence but made no examination of the body at that time. Later he conducted an autopsy. The appellant was questioned by the sheriff and Mr. Wells and, according to their evidence, he told them that he had not been upstairs, but on returning to the house at about 11:30 he observed that the house had been ransacked and the contents of the sideboard drawers dumped out upon the floor. Bloodhounds were sent for, arriving at about one o'clock. The dogs were taken to the upstairs and given a scent from one of the dresser drawers that was partly open. From there they went into various rooms upstairs, into the hall, smelled around a wardrobe, then down the stairs into the room where the sideboard drawers had been dumped out on the floor, out of the front door onto the porch and stopped by the appellant. They were then taken into the basement and followed a scent or trail up the basement stairs to the landing, out through the basement door, around the house west and north, then back to the east or front side of the house, again stopping at the appellant.

After the funeral the appellant was taken to Kansas City by the sheriff and county attorney, where he was questioned for some time and made a written statement in which he declared his innocence and gave his version of what transpired in the home on the morning of the tragedy, and his theory of the crime. He said that he returned home from taking Morgan to the farm about 8:30, just as his little daughter was preparing to start for school. He was in the house for a short time, perhaps about fifteen minutes, and then went to the barn to do some chores. His wife came to

the barn and told him that a tramp had been at the door asking for something to eat and that she refused his request. He asked his wife what time it was and she told him it was 10:30, which was time for him to make his business trip to town. He backed the car out of the garage and drove to the business part of town, transacting business at different places, including the bank, and on his return he stopped at the mail box at the front gate for the mail. He drove the car into the garage and went to the pasture and drove some cattle into the barn lot. He entered the east door of the house and the first sight that met his eyes was the contents of the sideboard drawers dumped out on the floor. He immediately telephoned the sheriff's office, advising them that his house had been robbed. He then went into the other rooms of the house, including the upstairs, through the kitchen and down into the basement. When he reached the landing at the middle of the basement stairs he saw his wife lying on the basement floor, on her face, with blood about her head. He called her name and placed his hand on her left wrist. It was getting cold and he knew she was dead. He immediately called the sheriff a second time, advising him that he had found his wife dead in the basement, and the sheriff came immediately to the home.

The theory of the state was that the appellant killed his wife to obtain possession and control of her property, and that the derangement of the contents of the sideboard and dresser drawers was a subterfuge concocted by the appellant to shield himself and provide a defense. The theory of the appellant was that either the tramp who had been refused food returned, searched the house and killed Mrs. Netherton, or that some person believing that the appellant kept considerable money in the house had, while the appellant was on his mission in town, entered the house with intent to rob and on discovering the deceased in the basement killed her to avoid identification.

The undisputed facts are that Edith Netherton, a woman without known enemies, was cruelly murdered in her home some time between 8:30 and 11:30 on the morning of February 24, 1928. During this time the appellant was, with the exception of the hour spent in town, at the scene of the murder. He would, on the death of the deceased, inherit one-half of her property, which was of the value of about $65,000.

We have the crime and the motive, and it was a question for

the jury to determine from all the evidence and circumstances whether the appellant fired the fatal shot. Evidence of his conduct before and after the crime shows that there was little or no grief; that he appeared to be cool and undisturbed throughout the investigation; that he changed his story on some important matters. His explanation of how he acquired the $34,000 in bonds may not have been satisfactory to the jury, and there was some evidence indicating that the deceased had kept careful control of her property, keeping it in a box in her name. The bloodhound testimony, which in itself was not strong, but when considered in connection with the conduct of the appellant and his explanation of where he had been on the morning of the crime, together with his general demeanor, theories and explanations as to how the crime may have been committed, created a chain of circumstances which, in our judgment, warranted the jury in finding the appellant guilty. On the other hand, the appellant adduced evidence to the effect that a tramp had been seen near the premises that morning, and other circumstances which would indicate that the crime may have been committed by some other person and the motive robbery. This evidence fairly submitted to the jury under proper instructions presented a question of fact for the jury, and this court, where there is substantial evidence to support the verdict, cannot again weigh the testimony but is bound to accept the finding of the jury when approved by the trial court.

It is contended by the appellant that the court erred in sustaining the objection to the offer of expert testimony as to the distance which shots fired in the basement from a .25 caliber automatic pistol could be heard. This evidence was offered on the theory that neighbors lived within 200 feet of the residence, and that a shot could be heard at that distance; that one with the intelligence of the appellant would not, under such circumstances, have chosen such means of murder. The evidence could properly have been admitted, but we do not think the refusal of the court to admit the testimony materially prejudiced the rights of the appellant. On the other hand, the testimony was not produced on the hearing of the motion for a new trial, and the error, if any, is not available on appeal. (*State v. Vandruff*, 125 Kan. 496, 264 Pac. 1060.)

The appellant contends that the court erred in admitting the testimony of Doctor Moberly, the coroner, wherein he testified to his

opinion as to the length of time Mrs. Netherton had been dead when he first saw the body. Doctor Moberly had been a practicing physician for many years and had been coroner of Johnson county for ten years, during which time he had had experience in examining dead bodies. He detailed the condition of the body and the surroundings, and gave it as his opinion that she had been dead from two to three hours. Courts have held that this is a proper subject for expert testimony. (*White v. The State,* 136 Ala. 58; *Palmer v. Schultz,* 138 Wis. 455.) The testimony, however, was admitted without objection and the appellant offered evidence, to refute the opinion of Doctor Moberly. The error, if any, in the admission of the testimony was waived by the appellant. (*State v. Greenburg,* 59 Kan. 404, 53 Pac. 61; *Snyder v. Rankin,* 120 Kan. 186, 243 Pac. 287.)

It is next contended that the court erred in denying the appellant's motion to strike out the testimony concerning the action of the bloodhounds and in failing to withdraw it from the consideration of the jury. The motion was that the evidence be taken from the jury "for the reason that there is no evidence introduced before this court justifying the starting point where it is supposed these bloodhounds were laid on the trail of some person." No objection was made as to the qualification and training of the bloodhounds. Evidence was adduced pro and con on the qualification of the dogs, and this question appears to have been fairly threshed out before the jury, and we must assume, since no question is raised, that the jury were properly instructed. According to the testimony of the manager of the dogs, they were given the scent from stuff in a dresser drawer upstairs. It is contended by the appellant that this was the appellant's room which he had occupied the night before and that he had been in the room the morning after discovering that the house had been entered and found that the drawers of the dresser in his room had been ransacked. The sheriff and Mr. Wells testified that the appellant told them on their arrival at the house that he had not been upstairs, and the upstairs was thereafter kept closed for the purpose of preserving the condition until the arrival of the bloodhounds. The information the sheriff then had fully warranted him in directing that the bloodhounds be started upstairs. The law is that before the testimony of the trailing of bloodhounds of one charged with a crime may be used in evidence it must be shown that the bloodhounds were laid on a trail at a point where

the circumstances tend clearly to show that the guilty party had been or on a track which the circumstances indicate to have been made by him. (*Pedigo v. Commonwealth*, 103 Ky. 41.) The evidence of the sheriff and Wells as to the statement of the appellant established a *prima facie* showing that the appellant had not been upstairs and that the alleged derangement of the dresser drawers was by the alleged robber, and we think the evidence was properly admitted. It was for the jury to determine the weight to be given the evidence under all the circumstances.

It is next contended that the court, in overruling the motion for a new trial, relied upon material facts as proven by the evidence, which were not in evidence. The court, in passing on the motion for a new trial, reviewed in a comprehensive manner the evidence in the case and made the statement that the evidence showed that the breakfast dishes in the kitchen had not been washed. The court's attention was called to the fact that there was no evidence on this question. There appeared to be a dispute between the attorneys as to just what the record was in this regard. A careful examination of the records indicates that the testimony did not show that the dishes were not washed. A perusal of the statement made by the trial court in passing on the motion for a new trial is convincing that the trial court fully realized its responsibility, and had a clear and comprehensive understanding of the testimony, and fully considered all of the questions raised by the appellant in the motion.

It is next contended that there was misconduct of attorneys on the part of the state which was so prejudicial as to deprive the appellant of a fair trial. The case was closely contested. The appellant was represented by able counsel, and from the record we glean that at the beginning of the argument the court, realizing the importance of the case, advised counsel that if any exceptions were to be taken the exception should be in writing and passed to the court. But one objection appears to have been made after the announcement of that rule, which was to the following statement:

"Now, if Doctor Netherton didn't kill his wife, who did? Will you gentlemen, when you come to retire and deliberate on this question, ask yourself and ask, Who did kill Mrs. Netherton? Who had any motive for killing her? She had no enemies in the country. There was no one that was jealous of her. There is not a word of evidence to prove that there was anything to create any motive in the mind of any living person to commit any crime, much less the crime committed on this occasion."

The court overruled the objection to this statement. Was this error? As a general rule exclusion argument which calls for the defendant to clear himself by pointing out who committed the crime is improper. The law shields him with a cloak of presumed innocence, and it is not his duty or responsibility to produce the guilty party. We do not think, however, in this instance the argument is such an infraction of the rule as to amount to prejudicial error.

We have examined with care the other complaints with reference to the argument of counsel to which no objection was made, but we do not find they amount to reversible error.

We have carefully examined the evidence and read with interest the able arguments made by counsel, and we are of the opinion that the evidence is sufficient to sustain the judgment of the trial court, and that there is no reversible error in the record.

The judgment is affirmed.