No. 31,685

THE STATE OF KANSAS, *Appellee*, v. ARTHUR RYAN, *Appellant*.

(42 P. 2d 591)

Opinion filed April 6, 1935.

*T. W. Bell* and *C. M. Stokes*, both of Leavenworth, for the appellant.

*Clarence V. Beck*, attorney-general, and *Maurice O'Keefe*, county attorney, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: Arthur Ryan was convicted of manslaughter in the first degree, and appeals. The former conviction for the same

homicide was set aside for prejudicial error. (*State v. Ryan,* 137 Kan. 733, 22 P. 2d 418.)

Defendant is a colored man, and prior to this homicide he had resided for some years in the three-room house of a colored woman, Lou Taylor, otherwise known as Lou Beck, in Atchison. They were not formally married to each other, and both had police-court records, he for petit larceny and vagrancy; she had been fined and jailed for some breach of the liquor law; and her house had been repeatedly raided by the police.

The foregoing preliminary statement may aid to an understanding of the background of the tragedy which occurred on September 2, 1931. On that evening defendant and Lou Beck were in their home, and another colored woman, Nora Belle Waterhouse, was with them. Three white men, Ernest Penny, Bob Wolters, and "Dr." Gilmore, called at the house for the purpose of getting drinks of whisky. They were served in the kitchen by Lou Beck. From this point the record is so confused and contradictory that no narrative of the facts can be set down with complete assurance of its accuracy. It seems that some vulgar conversation ensued and some indecent proposals in unprintable language were made to the two women. Penny was a large man and may have been partly intoxicated. There was evidence that one or more of the trio of visitors laid hands on Lou Beck and that she and defendant pleaded with them to let her alone. Be that as it may, defendant, Penny and Wolters went into the front room. Gilmore temporarily had stepped outside. Penny and defendant got into an altercation, possibly because of the vulgarity of the white men and because of their refusal to leave the house. Defendant either had a revolver on his person or obtained one in the front room. Wolters laid hold of Penny and endeavored to persuade him to leave the house. Gilmore returned and he also put his hand on Penny's shoulder and urged Penny to leave. Penny shoved Gilmore against the wall and the latter fell partly to the floor. About that time defendant shot Penny three times. He died in the hospital the same night.

Defendant left the city immediately in his automobile and drove toward Kansas City. En route he threw away his revolver, and abandoned his car, walked part way, caught a freight train and rode into Kansas City. He kept out of reach of the Atchison county authorities for about two months, and in the interim he

married Lou Beck. Eventually he was arrested, bound over for trial, and convicted by a jury in the district court of the crime of murder in the second degree, but the judgment and sentence were set aside by this court. (*State v. Ryan,* supra.) In the new trial ordered, he has been convicted of manslaughter in the first degree and sentenced pursuant thereto.

On this latter judgment and sentence defendant comes before this court again, complaining of various errors which we will consider in the order in which they appear in the brief of his counsel.

1. Appellant raises an objection to the sufficiency of the information, but it has not been submitted for our inspection. The record does not disclose that its sufficiency was challenged in the district court, and the error now based thereon cannot be sustained.

2. It is next urged that appellant's motion to discharge the jury should have been sustained on the ground that there were no colored men on the panel or venire. No showing was made that the jury lists were not fairly made, or that the panel was not fairly drawn. Indeed, we would have to consult statistics *aliunde* the record to be advised if there is any considerable number of colored people residing in that county or that those who may reside there are qualified for jury service under the statute. (R. S. 43-101 *et seq.*)

3. The next point mentioned in appellant's brief pertains to a motion in arrest of judgment, but it does not appear in the record; the grounds upon which it was based are not shown, and no error in respect to it is made to appear.

4. The next error urged relates to the instructions given and refused. Those given have been examined, and particularly the one dealing with manslaughter in the first degree. As given it conformed to our statute (R. S. 21-407), and "murder at the common law" as used in the statute was defined and explained in accordance with the rule laid down in *Craft v. State,* 3 Kan. 450, as modified in *State v. Rumble,* 81 Kan. 16, 21, 105 Pac. 1. See, also, exhaustive discussion of this general subject in *State v. Custer,* 129 Kan. 381, 282 Pac. 1071, 67 A. L. R. 909; also, Pattison's Instructions in Criminal Causes, sec. 657. Counsel for the state suggest that the instruction as given in appellant's brief is typographically inaccurate. That is quite apparent. Moreover, the record does not contain the text of the court's instruction and no error can be predicated on this point.

5. Error is next assigned on instruction 29, which explained the evidential significance which the jury might attach to the fact of

defendant's flight immediately after the homicide. The instruction given was not erroneous, and conformed quite closely to the rule announced in *State v. Ryan,* supra.

6. Error is also urged on the trial court's refusal to give nine specific instructions requested by defendant. Those have been examined. Seven of them were given in substance, and two, Nos. 7 and 12, were properly refused.

In defendant's brief the following appears:

"The defendant further presents to the court in his argument and brief that the instructions of the court throughout the trial were misleading, vague and of a compromising nature, to be fumbled, and disconcert the jury in its deliberation, all to the detriment of this defendant. Great prejudice was shown all through the trial and in all the acts of the court herein. Continuous remarks were made that this was a white man killed by a Negro, and the Negro was an outlaw and bad character and the white man was of the higher type of citizens of Atchison county, Kansas."

This criticism of the instructions is ill-founded. The statement that "great prejudice was shown" and that "continuous remarks" were made to incite and foster racial prejudice is wholly gratuitous on the part of the defendant and his counsel. The record reveals nothing of the sort. No such situation was called to the court's attention during the trial, nor when the motion for a new trial was presented. On this matter no error appears.

7. The next error pressed on our attention is more serious. In his closing argument to the jury the county attorney, over repeated and timely objections of defendant's counsel, traveled outside the record and transcended the limits of fair debate. The record recites:

(COUNSEL FOR DEFENDANT): "The defendant objects to the remarks of the county attorney in charging that this home of Arthur Ryan and Mrs. Ryan is a house of prostitution and that there were two women there who were prostitutes, . . .

"Overruled.

"Defendant excepting.

(COUNSEL FOR THE STATE): "The county attorney did not say that the two women were prostitutes, he said that in pointing to the defendant and Lou Beck, that they were prostitutes.

(COUNSEL FOR DEFENDANT): "The defendant objects to that as there was not a word of testimony offered showing that this was a house of prostitution, and the defendant asks that the jury be discharged and the defendant dismissed from further trial.

"Overruled.

"Defendant excepting.

". . . Ryan is a perjurer and an outlaw and he has worked five days in five years, and what do you call him?

"A man selling whisky with this prostitute (Lou Beck) there, and that is what I call her. . . .

"Lulu Beck, Lulu Deal, Lou Taylor, Lou Stone and now Lou Ryan, and I dared her to bring a marriage certificate up here . . . she was not married; that was a big stall. If they had been common-law man and wife they would not have needed to have been married; I do not think they were married. . . .

"In all my experience I have never heard so many lies from these defendants. . . .

"You have heard the oratory of (counsel for defendant) and you know where such a phrase came from as was used by the defendant and Lou Beck or Ryan . . . it is an expression of prostitutes—home—what did these men go there for; it has been raided a number of times and they found a gallon of liquor, and why did they raid her; because people got drunk out there and they found liquor there at times; Gilmore knew it was there; . . . he calls them rats; some are wet and some are dry; he calls them rats because they went there to get a drink, they knew it was there, and had been running there since 1927 when she was first arrested.

"It would be an outrage to set this man loose. A lot of people back there (indicating) tittered when this case was being argued. . . .

"He (Ryan) gets into his car and ditches it; he carried the gun in his hand for three miles, and it would not have made any difference who intercepted him, he would have killed whoever tried to stop him. . . . And he went to the lower yards and catches a train. A man is on the jury that I think knows where these trains are made up; . . .

"You cannot afford, in view of this evidence, to turn this man loose and probably do again what he has already done. . . .

"It is a dark spot on this community. It is going to remain like this until this man is sent to the—down there where he will be safe and where people will be safe. Safe for the people here and lives and same for those that titters."

Defendant's repeated and timely objections to the sort of argument just quoted were well taken. Indeed, it was the trial court's duty on its own motion to interfere and put a stop to it and to admonish the jury that such vituperation and abuse of defendant and all matters not in evidence stated or implied in the address of counsel should be disregarded. (*State v. Gutekunst*, 24 Kan. 252; reprint and note.) In *State v. Baker*, 57 Kan. 541, 46 Pac. 947, it was said:

"Where the county attorney in his closing argument to the jury repeatedly uses abusive and improper language calculated to create prejudice against the defendant, and the court, after objection made, fails to check him or to instruct the jury to disregard his remarks, the defendant is entitled to a new trial." (Syl. ¶ 4.)

In *State v. Powell*, 120 Kan. 772, 245 Pac. 128, a conviction for felonious violation of the banking act was reversed, one of the grounds therefor being the "acrimonious harangue" and "licensed

invective" of the prosecutor, which this court denounced as "derogatory to the dignity of the trial court, the decorum of the trial, and against the interest of truth and justice."

See, also, *State v. Netherton,* 128 Kan. 564, 279 Pac. 19; 16 C. J. 890-900.

It need hardly be added that such a diatribe as that quoted above cannot be printed in our official reports and bear the seal of our judicial approval. Neither in the interest of simple justice to defendant can his complaint thereat be ignored. The court holds that the closing argument for the prosecution was prejudicial, and the failure of the trial court to check it and to admonish the jury to disregard it renders it impossible for this court to affirm the judgment.

The judgment is therefore reversed, and the cause remanded for a new trial.