No. 45,446

STATE OF KANSAS, *Appellee*, v. NORRIS R. FLEURY, *Appellant*.

(457 P. 2d 44)

Opinion filed July 17, 1969.

*Stephen K. Lester,* of Wichita, argued the cause and *Ralph E. Gilchrist* and. *Carl L. Buck,* both of Wichita, were with him on the brief for appellant.

*Donald Foster,* Deputy County Attorney, argued the cause and *Kent Frizzell,*. Attorney General, and *Kieth Sanborn,* County Attorney, were with him on the· brief for appellee.

The opinion of the court was delivered by

FROMME, J.: Norris R. Fleury was tried and convicted by a jury of impersonating a highway patrolman (K. S. A. 21-1617) and of· forcible rape (K. S. A. 21-424). He was tried and found not guilty of first degree kidnapping.

This is a direct appeal from the judgment and sentence for forcible· rape. Defendant does not appeal from the charge of impersonating.

a highway patrolman. He was sentenced as an habitual criminal on the charge of forcible rape to not less than 10 nor more than 42 years as a second offender.

He specifies four errors. First, he questions the sufficiency of the evidence to establish forcible rape. Defendant admitted having sexual intercourse with the complainant on this occasion but testified it was accomplished with the woman's consent and cooperation. His testimony was in sharp conflict with the evidence introduced by the state.

In reviewing the sufficiency of the evidence the function of an appellate court is limited to ascertaining whether there was a basis in the evidence for a reasonable inference of guilt. (See *State v. Helm,* 200 Kan. 147, 151, 434 P. 2d 796 and cases cited therein.)

The complainant, Mrs. Connie Wedel, testified generally as follows: On May 5, 1967, she accompanied her husband and a friend to a Wichita tavern, the Green Onion. The three of them were in the Green Onion from 9:30 p. m. until shortly after midnight. An argument between Mr. and Mrs. Wedel erupted over their beer and Mrs. Wedel, who was seventeen years of age, left the table for the purpose of calling her parents to have them come and get her. She was using a telephone. The defendant Fleury appeared, reached out, depressed the receiver and disconnected the line. He introduced himself as a Kansas highway patrol officer and offered to help. Mrs. Wedel had been crying. When she told him of her argument with her husband he seemed sympathetic and offered to take her home. At first she refused. In her presence he called her parents and told them he was Lieutenant Nick Satino of the Kansas Highway Patrol. He explained the situation to her parents and told them he was bringing their daughter home. Mrs. Wedel was concerned about his identity, so he produced his billfold which had a badge imprint on it. The defendant then talked with her husband. The husband asked the wife if she wanted to go to her parents' home. When she said she did the husband told defendant to be sure and take her right home. The defendant told the husband not to make any trouble or follow them for he had a shotgun in his car.

Mrs. Wedel further testified the defendant drove north toward Benton, Kansas, where Mrs. Wedel's parents lived, then he turned and drove south into the country. Mrs. Wedel became suspicious and asked to use a restroom. Defendant stopped his car beside the

road. When she got back in the car he began to make improper advances. She resisted. Finally she feigned illness and got out of the car. The defendant got out of the car a little later and pushed her back into the car. He advised her to give in to his advances or walk. She got out of the car and walked down the road with the defendant following in the car. She reversed her direction and the defendant backed his car. She left the road and started to cross into an open field. The defendant left the car and forcibly returned her to the front seat and proceeded to rape her. Defendant drove Mrs. Wedel back to the outskirts of Wichita and let her out of the car. She called her parents and then waited at a nearby house.

The house was at 47th and Seneca in Wichita, Kansas. Mrs. Strandberg testified she was awakened early in the morning by a knock on the door. Mrs. Wedel asked Mrs. Strandberg if she might stay there until her parents came to get her. Mrs. Wedel was crying and shaking. Her hair and clothing were disheveled. She had mud on her shoes and clothing.

Mrs. Wedel's parents and the police arrived at 3:30 a. m. Mrs. Wedel was taken to a physician for examination. Although the doctor found no marks of violence on her body, a pelvic examination was completed and revealed male sperm cells in her vagina.

The complainant's husband and the friend who was with them at the Green Onion corroborated Mrs. Wedel's testimony as to defendant's impersonation of an officer. This corroboration included the reference to the shotgun in defendant's car. Mrs. Wedel's father confirmed the conversations with his daughter on the telephone. He testified as to her disheveled appearance and hysterical condition when he arrived to take her home.

There can be no doubt that there was a basis in the evidence for a reasonable inference of guilt. The state's evidence, if believed by the jury, was sufficient to sustain the charge of forcible rape.

Defendant next contends that the state failed to prove that venue was properly laid in Sedgwick county.

As a general rule venue is a question of fact to be determined by the jury in the trial of the case in chief. (*In re Stilwell*, 135 Kan. 206, 10 P. 2d 15.) Venue may be established by proof of facts and circumstances introduced in evidence from which venue may be fairly and reasonably inferred. (*State v. Joseph Little*, 201 Kan. 101, 439 P. 2d 383.)

The evidence introduced by the state established that Mrs. Wedel was picked up by defendant in the city of Wichita, taken into the country near Haysville, raped and returned to the city of Wichita. Mrs. Wedel testified the crime was committed in a rural area shortly after passing through Haysville.

K. S. A. 60-409 in part provides:

"(*b*) Judicial notice may be taken without request by a party, of . . .

"(3) such facts as are so generally known or of such common notoriety within the territorial jurisdiction of the court that they cannot reasonably be the subject of dispute. . . ."

Judicial notice may be taken that both Wichita and Haysville are located within the boundaries of Sedgwick county by more than six miles. Although the complainant did not specifically testify the rape occurred in Sedgwick county, there is a basis in her testimony for a reasonable inference the crime was committed in Sedgwick county. Haysville is located therein.

The question of venue was properly submitted to the jury and their determination will not be disturbed by this court.

The defendant next specifies error based upon failure of a detective to give a full and complete Miranda warning. Defendant was not advised that if he was indigent he was entitled to the presence of court appointed counsel before being questioned.

In *Miranda v. Arizona*, 384 U. S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, the high court specified the extent of the advice of rights required to protect the constitutional rights of an accused as follows:

". . . Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. . . ." (16 L. Ed. 2d 706, 707.)

The Court in *Miranda* spelled out the extent and purpose of advising an indigent of his right to appointed counsel as follows:

"In order to fully apprise a person interrogated of the extent of his rights under this system then, it is necessary to warn him not only that he has the right to consult with an attorney, but also that if he is indigent a lawyer will be appointed to represent him. Without this additional warning, the admonition of the right to consult with counsel would often be understood as meaning only that he can consult with a lawyer if he has one or has the funds to obtain one. The warning of a right to counsel would be hollow if not couched in

terms that would convey to the indigent—the person most often subjected to interrogation—the knowledge that he too has a right to have counsel present. As with the warnings of the right to remain silent and of the general right to counsel, only by effective and express explanation to the indigent of this right can there be assurance that he was truly in a position to exercise it." (16 L. Ed. 2d 723.)

Detective Werbin was permitted to testify of an interview with defendant at the sheriff's office as follows:

"A. I advised him he may call an attorney at this time by using the telephone just outside of the interview room in the main office, which was the squad room of the Detective Division. He may have his attorney present at the time he was being interviewed, at this time, and he was also advised any statements he makes, oral or written, can be used—and will be used against him in a Court of law. He was also advised then that he did not have to make any statement. He was advised no threats or promises are being made to him. I also asked him if he knew these rights I just had advised him of. He stated yes.

"Q. Okay. And after that, did you talk to him some more?

"A. I did.

"Q. And what was the conversation?

"A. The conversation was in regard to a Connie Wedel who'd been—

"Q. What did you ask him and what did he say?

"A. I asked him if he knew Connie Wedel.

"Q. Okay.

"A. He stated he did not. I also asked him if he had impersonated a Lieutenant Nick Satino of the Kansas Highway Patrol and he stated no. After I talked with him for a few minutes, he then stated he did take some girl from the Green Onion club. However, he did not know her name. After two or three minutes, he did take a piece of paper from his wallet, which was a white piece of paper, and on the paper it had Connie Wedel of Benton, Kansas, with a phone number on it, which was her Dad's phone number.

"Q. Uh-huh. Any further conversation?

"A. I also asked him how come he impersonated a Highway Patrolman. First again, he denied it. Then he stated that he was trying to impress her.

"Q. Are those his exact words, as best you can recall?

"A. That isn't his exact words.

"Q. Can you more accurately quote what he did say?

"A. 'You know, Syd, I was just trying to impress the girl a little.'

"Q. Is that what he said to you?

"A. Yes."

Since Detective Werbin failed to advise defendant that if he was indigent he had a right to the presence of an appointed attorney, defendant urges a rule of automatic reversal upon this court and argues the Miranda warnings are an absolute prerequisite to admission in evidence of custodial statements elicited from a

defendant. He contends no conviction can stand if a defendant's statements are introduced at the trial and it is shown the defendant was not fully advised of his rights, for without such advice of his rights he cannot intelligently waive this constitutional right against self-incrimination.

On the other hand the prosecution points out the United States Supreme Court has recognized a harmless-error rule which does not require reversal of a conviction where the error or defect had little, if any, likelihood of having changed the result of the trial. In *Chapman v. California*, 386 U. S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824, it was said:

"We are urged by petitioners to hold that all federal constitutional errors, regardless of the facts and circumstances, must always be deemed harmful. Such a holding, as petitioners correctly point out, would require an automatic reversal of their convictions and make further discussion unnecessary. We decline to adopt any such rule. All 50 States have harmless-error statutes or rules, . . . All of these rules, state or federal, serve a very useful purpose insofar as they block setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial. We conclude that there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." (17 L. Ed. 2d 709.)

Later in that opinion, while commenting on *Fahy v. Connecticut*, 375 U. S. 85, 11 L. Ed. 2d 171, 84 S. Ct. 229, the high court said:

". . . We, therefore, do no more than adhere to the meaning of our Fahy Case when we hold, as we now do, that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. . . ." (17 L. Ed. 2d 710.)

Our Kansas harmless-error rule has been incorporated in the statutory law of this state. (See K. S. A. 60-261 and K. S. A. 62-1718.) Our harmless-error rule applies unless the error is of such a nature as to appear inconsistent with substantial justice. Our courts are directed to disregard any error or defect in the proceedings which does not affect the substantial rights of the parties.

The federal harmless-error rule declared in *Chapman* requires an additional determination by the court that such error was harmless beyond a reasonable doubt in that it had little, if any, likelihood of having changed the result of the trial.

Other states have recognized and applied the federal harmless-error rule as declared in *Chapman* to instances where the Miranda

warning was not fully and completely given. (*State v. Gray*, 268 N. C. 69, 150 S. E. 2d 1 (1966), cert. den. 386 U. S. 911, 17 L. Ed. 2d 784, 87 S. Ct. 860; *Commonwealth v. Wilbur*, (Mass.) 231 N. E. 2d 919, cert. den. 390 U. S. 1010, 20 L. Ed. 2d 161, 88 S. Ct. 1260; *Commonwealth v. Padgett*, 428 Pa. 229, 237 A. 2d 209 (1968).)

In *State v. Phinis*, 199 Kan. 472, 430 P. 2d 251, we considered the guidelines set forth in *Miranda* for the advice of constitutional rights and determined the guidelines had been substantially complied with in that case. In *State v. Faidley*, 202 Kan. 517, 450 P. 2d 20, a failure to comply with *Miranda* guidelines was again urged on this court and rejected on the ground the privilege against self-incrimination did not apply to nontestimonial acts, such as the result of a coordination or sobriety test. In neither of these cases was the federal harmless-error rule examined or applied. However, in *Faidley* this court cited both *Chapman v. California*, supra, and *Commonwealth v. Wilbur*, supra, with approval.

We are convinced our harmless-error rule has a sound basis in the jurisprudence of this state, and when our rule is to be applied to a federal constitutional error our courts should apply the same in the light of what was said in *Chapman*. By this we mean a court in applying our harmless-error rule must be able to declare the federal constitutional error had little, if any, likelihood of having changed the result of the trial, and the court must be able to declare such a belief beyond a reasonable doubt.

Let us examine the error complained of in the present case in light of this harmless-error rule. The error complained of is that defendant was not advised if he was indigent he was entitled to the presence of court appointed counsel and that later statements elicited from defendant were admitted against him.

At the time of his arrest defendant was regularly employed by Continental Bakers. The detective testified he had known the defendant for seven years. The detective's personal knowledge of the defendant's circumstances no doubt contributed to his oversight in the advice of rights given. The defendant was represented throughout the trial by retained counsel of his choice. The defendant took the stand in his own defense and admitted having sexual intercourse with Mrs. Wedel, but he denied the use of force. He testified she was a willing participant in the act. Defendant does not appeal from his conviction for impersonating an officer. The conversation with defendant at the sheriff's office largely related to the charge of

impersonating an officer and we are not concerned with that conviction.

In the court below defendant was contesting the forcible rape charge on the ground no force was used to accomplish the act. There was little, if anything, in the testimony of Detective Werbin which defendant had not previously testified to in his own defense. At the trial the defendant raised only one question. Was force used to accomplish the sex act? The testimony of Detective Werbin which is quoted in this opinion did not bear upon that question.

Therefore, we determine the error in admitting the testimony of Detective Werbin concerning the statements of defendant at the sheriff's office had little, if any, likelihood of having changed the result of the trial. We declare the error was harmless beyond a reasonable doubt and did not affect the substantial rights of the defendant.

The final specification of error relates to misconduct of the prosecutor in his closing argument. Only one objection was made during the entire closing argument. The objection was overruled by the court. The portion of the argument objected to at the trial reads:

"Because the defendant was so accomplished in raping Connie Wedel, you are asked to turn him loose? He did it without leaving a mark. That's pretty good. Well, I wondered that, too. No signs of violence, I wonder how long this will be with her. Put that on your conscience."

During argument on motion for new trial defendant contended and now contends the statement was prejudicial, not supported by evidence and the prosecutor was trying to imply that Mrs. Wedel had suffered mental impairment as a result of the rape. The defendant reads into these statements more than the words themselves connote. He does so in an attempt to bring the statement within the facts of *State v. Wilson*, 188 Kan. 67, 360 P. 2d 1092. The prejudicial error injected into the Wilson case arose from a newspaper article read to the jury by the county attorney. The newspaper article referred to the Chessman case in which the victim had lost her mental faculties. The Chessman case had received massive publicity. The court pointed out there was no evidence to indicate the complainant in *Wilson* was losing or had lost her mind. The use of the newspaper article was an attempt to introduce extraneous facts, not disclosed by evidence, which would prejudice the jury.

The argument in the present case cannot be considered as even

approaching the misconduct disclosed in *State v. Wilson,* supra. We find no misconduct which would prejudice the substantial rights of the defendant.

The defendant singles out for comment on appeal three other portions of the prosecutor's closing argument. These three portions of the argument were not objected to at the trial. No argument was presented on them to the trial court when the motion for new trial was heard.

It is well settled that reversible error cannot be predicated upon a complaint of misconduct of counsel in the closing argument to the jury where the defendant makes no objection to the misconduct and makes no request to have the court admonish the jury to disregard the objectionable statements. (*State v. Latham & York,* 190 Kan. 411, 437, 375 P. 2d 788; *Roda v. Williams,* 195 Kan. 507, 515, 407 P. 2d 471; *State v. Wyman,* 198 Kan. 666, 670, 426 P. 2d 26; *State v. McDermott,* 202 Kan. 399, 405, 449 P. 2d 545.)

The trial court included the following in his instructions to the jury:

"Statements, arguments, and remarks of counsel are intended to help you in understanding the evidence and in applying the law, but they are not evidence. You should disregard any such utterance that has no basis in the evidence."

We must assume the jury followed this instruction and disregarded any remarks of counsel which had no basis in the evidence.

In conclusion we note the State justifies the nature of these remarks by explaining they were provoked by the argument of defense counsel. We do not wish to approve the remarks. They are examples of bad oratory. The primary purpose of closing argument is to enlighten the jury so they may render a correct verdict. Counsel should not go beyond fair comment on the law and the evidence in the case under consideration. (*State v. Wilson,* supra; *State v. McDermott,* supra.)

We have carefully examined the record in light of all specifications of error and find no prejudicial error.

FONTRON, J., dissenting: In my opinion, the prosecutor's final argument was so inflammatory and so filled with invective as to deny the accused a fair trial.

The court has quoted but a small part of the intemperate language which flowed from the lips of the prosecution. Other passages are equally offensive. Some of them must be quoted before the devas-

tating effect of the prosecution's diatribe can be fully appreciated.

Preceding the language set out in the majority opinion, these purple passages appear in the record.

". . . She was no match for his ego. He wanted what he wanted and everything else. Just forget it—I'll get what I want, and he got it. . . .

". . . how many women have not some time in their life imagined themselves with their stockings stuck down their throat and a pair of jeans wrapped around their neck? . . .

"There were millions of people who walked to their death at Beuchenwald [sic] in World War II. How many of those do you think had given up hope? They just couldn't imagine that anyone would pull such an enormity. He's not a gentleman; he has no respect for anybody but himself; and he has less respect for himself than anybody. . . ."

After the defendant's objection was overruled, counsel for the state, unabashed, continued in like vein and near the end of the bitter peroration came this passage:

". . . We submit that he [the defendant] went straight home and forgot about it and licked his chops. He got what he wanted; the hell with her."

To spread the entire summation upon the records of this court would take more space than can be justified. Hence, I would only add that the sections extracted reflect the tone of the entire summation.

For the court to say, in gentle reproof, that it cannot approve the language—that it is bad oratory—evidences small concern that the bounds of fair comment were grossly exceeded.

The majority opinion correctly points out that only one objection was interposed by the defense. That objection was to the language quoted by the court in its opinion. However, I believe the trial court should have evaluated the objection against the background of all the denunciatory language which had gone before. The impact of the quoted passage on the fairness of the trial, itself, should have been viewed within the framework of the harangue in its entirety. Considered in this context, I consider the trial court's overruling of the defendant's objection as constituting prejudicial error.

Moreover, the state's tempestuous tirade approaches, in my judgment, the proportions of general prejudice. Final summations of counsel serve a useful purpose in the adversary system only as they provide opportunities for fair comment and rational persuasion.

When summations become platforms for abusive invective they pervert the function they are designed to perform.

Many years ago, in times less sophisticated than ours, perhaps, but certainly no less sound or more disordered, this court voiced words of wisdom in *State v. Gutekunst*, 24 Kan. 252. They are relevant here:

". . . Where counsel refers to pertinent facts not before the jury, or appeals to prejudices foreign to the case, it is the duty of the court to stop him then and there. The court need not and ought not to wait to hear objection from opposing counsel. The dignity of the court, the decorum of the trial, the interest of truth and justice forbid license of speech in arguments to jurors outside of the proper scope of professional discussion. . . ." (p. 254.)

The *Gutekunst* case has frequently been cited with approval, the last occasion being as recently as 1961 where, in *State v. Wilson*, 188 Kan. 67, 360 P. 2d 1092, the foregoing passage was quoted in full.

In *Weaver v. Winchell*, 116 Kan. 296, 226 Pac. 719, an action to recover damages for alienation of affections, indefensible language was used in argument by plaintiff's counsel. No objection was interposed at the trial. Nonetheless, prejudicial error was found to exist, the court using these words:

"The remarks of counsel for plaintiff in the instant case could, and undoubtedly did, enter largely into the result of the jury's verdict and thereby prejudiced the rights of the defendant. Under the circumstances there should be a new trial." (p. 299.)

Misconduct of counsel during oral argument was alleged on appeal in *State v. Netherton*, 128 Kan. 564, 279 Pac. 19. No objection had been lodged against the offensive language until after the jury had retired. In an opinion reversing the conviction on this ground, among others, the court said:

". . . We think the failure of the court to admonish the jury to disregard these remarks was error, even if the jury had retired from the room before the request was made." (p. 575.)

Prejudicial error was held to have resulted from abusive language in *State v. Ryan*, 141 Kan. 549, 42 P. 2d 591, where the court declared:

"Defendant's repeated and timely objections to the sort of argument just quoted were well taken. Indeed, it was the trial court's duty on its own motion to interfere and put a stop to it and to admonish the jury that such vituperation and abuse of defendant and all matters not in evidence stated or implied in the address of counsel should be disregarded. . . ." (p. 553.)

The final words spoken by this court in the *Ryan* case appear to me as peculiarly appropriate under the present facts:

"It need hardly be added that such a diatribe as that quoted above cannot be printed in our official reports and bear the seal of our judicial approval. Neither in the interest of simple justice to defendant can his complaint thereat be ignored. The court holds that the closing argument for the prosecution was prejudicial, and the failure of the trial court to check it and to admonish the jury to disregard it renders it impossible for this court to affirm the judgment." (p. 554.)

It is my opinion that the prosecution's philippic merits strong disapproval and that this case should be returned for re-trial. Hence, I respectfully dissent.